**No. 24-721**

---

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

**EPICENTER LOSS RECOVERY, LLC**

*Plaintiff and Appellant,*

*v.*

**BURFORD CAPITAL LTD. AND GANYMEDE INVESTMENTS LTD.**

*Defendants and Appellees.*

---

Appeal from United States District Court
District of Arizona
Hon. Diane J. Humetewa
U.S. District Court Case No.
2:18-CV-03300-DJH

---

**APPELLANT EPICENTER LOSS RECOVERY, LLC'S OPENING BRIEF**

---

**WAYMAKER LLP**
Ryan G. Baker
rbaker@waymakerlaw.com
Sam S. Meehan
smeehan@waymakerlaw.com

515 S. Flower Street, Suite 3500
Los Angeles, California 90071
(424) 652-7800

*Attorneys for Appellant Epicenter Loss Recovery, LLC*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for Appellant Epicenter Loss Recovery, LLC certifies that it is not a publicly held corporation, that it does not have a parent corporation, and that no publicly held corporation owns 10 percent or more of its stock.

DATED: May 5, 2025          WAYMAKER LLP

By: */s/ Ryan G. Baker*
    RYAN G. BAKER
    *Attorneys for Appellant*
    *Epicenter Loss Recovery, LLC*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT .....................................................5

ISSUES PRESENTED FOR REVIEW ................................................6

STATEMENT OF THE CASE .............................................................7

I. THE PARTIES AND THE PREDICATE FOR THIS LITIGATION..................7

II. EPL AND GLF FILE SUIT AGAINST BURFORD AND GANYMEDE
    FOR BREACH OF IMPLIED COVENANT AND TORTIOUS
    INTERFERENCE................................................................................9

III. THE DISTRICT COURT COMPELS ARBITRATION ..................................11

IV. THE DISTRICT COURT DISMISSES WITHOUT PREJUDICE AND
    THIS COURT REVERSES THE DISMISSAL.............................................13

V. ARBITRATION RESULTS IN AWARDS AGAINST EPICENTER
   AND IN DISMISSAL OF EPICENTER'S CASE.........................................14

I. The District Court Erred in Granting the Motion to Compel Arbitration............20

    A.    In Granting the Motion to Compel, the District Court
           Erroneously Applied a Supposed Policy Favoring Arbitration
           That the Supreme Court Recently Clarified Was Not
           Appropriate................................................................................20

    B.    The Note Does Not Include an Arbitration Provision, and the
           District Court's Decision to Improperly Graft One into That
           Agreement Constitutes Reversible Error .............................................25

    C.    The District Court's Incorporation of the ICA's Arbitration
           Clause into the Note Improperly Creates Superfluous Terms ............31

    D.    The District Court Erred in Delegating the Arbitrability of
           Epicenter's Claims to the LCIA ..........................................................35

           1.    The Supreme Court's Recent *Coinbase* Decision
                  Highlights the District Court's Error in Delegating the
                  Question of Arbitrability to the LCIA ......................................36

           2.    There Was No "Clear and Unmistakable Evidence" of
                  Agreement to Delegate the Question of Arbitrability to
                  the LCIA ................................................................................40

i

3.      As a Nonsignatory to the ICA, Burford Could Not
            Enforce the Delegation Provision ...............................................43

    E.      The District Court Erred in Permitting Burford to Enforce the
            Arbitration Clause ................................................................................44

II. The District Court's Error Resulted in an Improper $10 Million Award
    and Personal Guaranty, Which Should Not Be Enforceable........................46

CONCLUSION ........................................................................................................48

# TABLE OF AUTHORITIES

**Page**

## CASES

*Al-Torki v. Kaempen,*
    78 F.3d 1381 (9th Cir. 1996) ............................................................6

*Armstrong v. Michaels Stores, Inc.,*
    59 F.4th 1011 (9th Cir. 2023) ........................................... 2, 24, 25

*AT & T Technologies, Inc. v. Communications Workers of America,*
    475 U.S. 643 (1986) .........................................................................43

*Aztar Corp. v. U. S. Fire Insurance Co.,*
    223 Ariz. 463 (2010) ................................................................ 34, 37

*Big Picture Group LLC v. Pate,*
    2014 WL 12567171 (C.D. Cal. June 17, 2014).................... 28, 32

*Bombardier Transportation (Holdings) USA Inc. v. HDR Engineering Inc.,*
    2022 WL 17811661 (D. Ariz. Dec. 19, 2022)................................25

*Brennan v. Opus Bank,*
    796 F.3d 1125 (9th Cir. 2015) .......................................................37

*Carcich v. Rederi A/B Nordie,*
    389 F.2d 692 (2d Cir. 1968) ...................................................2, 23

*Cloney's Pharmacy, Inc. v. Wellpartner, Inc.,*
    2024 WL 4349291 (S.D.N.Y. Sept. 30, 2024) ............................42

*Coinbase v. Suski,*
    602 U.S. 143 (2024)................................................................ passim

*Dean Witter Reynolds, Inc. v. Byrd,*
    470 U.S. 213 (1985).........................................................................24

*Dees v. Billy,*
    357 F. App'x 813 (9th Cir. 2009).................................................49

*Doran v. Oasis Printing House,*
    24 Ariz. 475 (1922).........................................................................34

*Edge v. TLW Energy Services, L.L.C.,*
    2023 WL 3267847 (5th Cir. May 5, 2023)....................................7

*Epic Systems Corp. v. Lewis,*
    584 U.S. 497 (2018)................................................................ 23, 24

*Equity Income Partners, LP v. Chicago Title Insurance Co.*,
    241 Ariz. 334 (2017) ................................................................... 33

*First Options of Chicago v. Kaplan*,
    514 U.S. 938 (1995) ................................................... 25, 36, 40, 41

*Freeman v. DirecTV, Inc.*,
    457 F.3d 1001 (9th Cir. 2006) .................................................... 21

*Gabourel v. Luxottica of America*,
    2023 WL 3050987 (C.D. Cal. Jan. 27, 2023) ........................... 26

*Goodman v. Newzona Investment Co.*,
    101 Ariz. 470 (1966) ................................................................... 34

*Granite Rock Co. v. International Brotherhood of Teamsters*,
    561 U.S. 287 (2010) ................................................................... 23

*Gray v. GC Services, LP*,
    256 Ariz. 480 (2023) ................................................................... 27

*Green Tree Financial Corp. v. Bazzle*,
    539 U.S. 444 (2003) ................................................................... 37

*Gregory v. Armstrong*,
    2023 WL 11983324 (9th Cir. Nov. 28, 2023) ........................... 25

*Henry Schein v. Archer & White Sales*,
    586 U.S. 63 (2019) ..................................................................... 38

*In re Axos Bank Litigation*,
    2024 WL 4195299 (S.D. Cal. Sept. 13, 2024) ......................... 42

*In re Murchison*,
    349 U.S. 133 (1955) ................................................................... 26

*Innospec Ltd. v. Ethyl Corp.*,
    2014 WL 5460413 (E.D. Va. Oct. 27, 2014) ....................... 44, 45

*International Ambassador Programs, Inc. v. Archexpo*,
    68 F.3d 337 (9th Cir. 1995) ....................................................... 28

*Kassbaum v. Steppenwolf Productions, Inc.*,
    236 F.3d 487 (9th Cir. 2000) ..................................................... 21

*Kramer v. Toyota Motor Corp.*,
    705 F.3d 1122 (9th Cir. 2013) ............................................. 43, 46

*Lawrence v. Department of the Interior*,
    525 F.3d 916 (9th Cir. 2008) ..................................................... 21

*LeBaron v. Crismon*,
    100 Ariz. 206 (1966) ................................................................... 28

iv

*Lower Colorado River Authority v. Papalote Creek II, LLC*,
  858 F.3d 916 (5th Cir. 2017) ...................................................................50

*Maher v. Wells Fargo Clearing Services, LLC*,
  2023 WL 11053622 (C.D. Cal. Dec. 12, 2023)........................................25

*McArdle v. AT&T Mobility LLC*,
  2017 WL 4354998 (N.D. Cal. Oct. 2, 2017) ............................................49

*Milenbach v. Commissioner of Internal Revenue*,
  318 F.3d 924 (9th Cir. 2003) ..................................................................21

*Mills v. ALA Management Services, Inc.*,
  2024 WL 4972003 (D. Ariz. Dec. 4, 2024)......................................... 39, 40

*Mitchell v. Wells Fargo Bank*,
  280 F. Supp. 1261 (D. Utah 2017) ..........................................................45

*Momot v. Mastro*,
  652 F.3d 982 (9th Cir. 2011) ..................................................................37

*Morgan v. Sundance, Inc.*,
  596 U.S. 411 (2022)........................................................... 2, 22, 24, 25

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*,
  460 U.S. 1 (1983)....................................................................................12

*National Foundation For Cancer Research v. A.G. Edwards & Sons, Inc.*,
  821 F.2d 772 (D.C. Cir. 1987)................................................................24

*Norman v. Recreation Centers of Sun City, Inc.*,
  156 Ariz. 425 (1988)......................................................................... 30, 33

*Offutt v. United States*,
  348 U.S. 11 (1954)..................................................................................26

*Oracle America, Inc. v. Myriad Group A.G.*,
  724 F.3d 1069 (9th Cir. 2013.)................................................................45

*Oracle America, Inc. v. Procore Technologies, Inc.*,
  2025 WL 1069892 (N.D. Cal. April 9, 2025) ..........................................40

*Peabody Holding Co., LLC v. United Mine Workers of America,
  International Union*,
  665 F.3d 96 (4th Cir. 2012) ....................................................................45

*R & C Oilfield Services LLC v. American Wind Transport Group LLC*,
  45 F.4th 655 (3d Cir. 2022) ......................................................................6

*Republic of Nicaragua v. Standard Fruit Co.*,
  937 F.2d 469 (9th Cir. 1991) ..................................................................21

*Rosenblum v. Tevelbyus.com Ltd.*,
  299 F.3d 657 (7th Cir. 2002) ..................................................................32

v

*Salve Regina College v. Russell*,
    499 U.S. 225 (1991)........................................................21

*Scherk v. Alberto-Culver Co.*,
    417 U.S. 506 (1974)................................................. 23, 24

*Scholten v. Blackhawk Partners*,
    184 Ariz. 326 (1995)........................................................33

*Scott v. Borg Warner Protective Services*,
    55 F. App'x 414 (9th Cir. 2003)....................................50

*SEIU Local 121RN v. Los Robles Regional Medical Center*,
    976 F.3d 849 (9th Cir. 2020) ..................................... 20, 22

*Shannon v. General Electric Co.*,
    186 F.3d 186 (2d Cir. 1999) .............................................6

*Snader v. JNR, Inc.*,
    2023 WL 11108003 (C.D. Cal. Aug. 17, 2023) ...............25

*Sun Valley Ranch 308 Ltd. Partnership ex rel. Englewood Properties, Inc. v. Robson*,
    231 Ariz. 287 (Ariz. Ct. App. 2012)................................48

*Taylor v. State Farm Mutual Automobile Insurance Co.*,
    175 Ariz. 148 (1993)........................................................27

*Terrell v. Torres*,
    248 Ariz. 47 (2020)....................................... 27, 33, 35

*Turner v. Charter Communications, LLC*,
    2024 WL 4919512 (9th Cir. Nov. 29, 2024) .................49

*United California Bank v. Prudential Insurance Company of America*,
    140 Ariz. 238 (1983)........................................................31

*Wagner v. Stratton Oakmont, Inc.*,
    83 F.3d 1046 (9th Cir. 1996) ..........................................12

*Wallace v. Casa Grande Union High School District No. 82 Board of Governors*,
    184 Ariz. 419 (Ariz. Ct. App. 1995)................................48

*Weatherguard Roofing Co., Inc. v. D.R. Ward Construction Co., Inc.*,
    214 Ariz. 344 (Ariz. Ct. App. 2007).......................... 30, 31

*Wilson v. Kemper Corporate Services Inc.*,
    134 F.4th 339 (5th Cir. 2025) .........................................49

*Wolsey, Ltd. v. Foodmaker, Inc.*,
    144 F.3d 1205 (9th Cir. 1998) ........................................21

*Young v. Bytedance Inc.*,
    700 F. Supp. 3d 808. (N.D. Cal. 2023)..........................................46

## STATUTES

28 U.S.C. § 1291 ........................................................................6

28 U.S.C. § 1332(a)(2)............................................................6, 11

9 U.S.C. § 205 ..........................................................................11

Ariz. Rev. Stat. § 47-1201.21(a) ...............................................30

## RULES

Fed. R. App. P. 4(a)(1)(A) .........................................................7

## INTRODUCTION

Arbitration promises greater efficiency and lower cost than court proceedings. But theoretical benefits of arbitration are offset by significant risks, which culminate in a process that can feature conflicts of interest, lack of transparency, limited disclosure and discovery, and virtually no review or recourse, ultimately depriving parties of the very due process rights the judicial system is meant to protect. In spite of these perils, many courts – including the district court here – have been overly deferential to what they viewed as an "overriding federal policy favoring arbitration." *See Carcich v. Rederi A/B Nordie*, 389 F.2d 692, 696 (2d Cir. 1968). Recently, however, this Circuit and the Supreme Court have clarified that agreements to arbitrate should be enforced like any other contract. *Morgan v. Sundance, Inc*., 596 U.S. 411, 418 (2022). And federal policy does not favor arbitration over other forms of dispute resolution. *See, e.g., Armstrong v. Michaels Stores, Inc*., 59 F.4th 1011, 1014 (9th Cir. 2023) ("[n]o longer is there a 'special' rule favoring arbitration," and "we recognize that there is no longer a thumb on the scale in favor of arbitration").

In this case, Epicenter Partners LLC ("EPL") and Gray Meyer Fannin LLC ("GMF") entered into several different contracts with Ganymede Investments Limited ("Ganymede") related to the financing of real estate litigation claims and the disbursement of assets recovered through those claims. Some of the contracts

1

contained agreements to arbitrate; others did not. The April 22, 2013 $51 million Promissory Note (the "Note") between EPL/GMF and Ganymede, the basis of the dispute before this Court, did not contain an arbitration agreement. Moreover, respondent Burford Capital Ltd. ("Burford"), Ganymede's parent, was not a party to the Note or any other agreements with EPL or GMF. Nor was Burford party to any agreement to arbitrate with EPL, GMF or appellant Epicenter Loss Recovery ("Epicenter" or "Appellant").

Ganymede and Burford thereafter acted to significantly diminish the Note and recovered asset's value, by indiscriminately marketing the Note at a substantial discount to EPL and GMF's competitors, all without notifying EPL and GMF or getting their approval. Ganymede's and Burford's actions resulted in scuttling all of EPL and GMF's pending transactions then in process (that would have timely paid off the Note), destroying EPL and GMF's reputation and creditworthiness, and ultimately the fire sale of the Note for $35 million. Burford's interference with and Ganymede's sale of the Note to a competing developer made it impossible for EPL and GMF to perform their duties under the Note and caused them to lose everything. As a result, EPL and GMF were forced out of business and into bankruptcy.

While in bankruptcy, they brought suit. Epicenter subsequently acquired EPL and GMF's litigation claims from the bankruptcy estate. Epicenter's second

2

amended complaint states three claims, all related to the Note. Ganymede and Burford admit that the "Note . . . does not include an independent dispute resolution clause." (2-ER-150.) The Note makes no mention of arbitration or the London Court of International Arbitration (the "LCIA"); the Note does not incorporate any LCIA rules.

In the trial court, Ganymede and Burford argued that the court was required to borrow the arbitration provision from another agreement, the Intercreditor Agreement ("ICA"), because the Note is "subject to" the ICA and because there is a conflict between the Note and the ICA. But there is no conflict. The ICA requires arbitration. The Note contemplates court proceedings.[1] Rather than reference arbitration, the Note specifically provides that GMF and EPL "shall pay all costs and expenses, including reasonable attorneys' fees and court costs, incurred in the collection or enforcement of all of any part of this Note." It further provides that "[i]n the event of any court proceedings, court costs and attorneys' fees shall be set by the court." These provisions have meaning, but they have been rendered

---

[1] EPL and GMF each filed for bankruptcy in May 2016, after which their liquidating trustee, R.O.I. Properties, LLC ("ROI"), was authorized by the Bankruptcy Court to pursue claims on behalf of EPL and GMF. (1-ER-9.) In August 2018, the Bankruptcy Court approved a settlement, which transferred the claims ROI had brought to EPL and GMF. (*Id.*) EPL and GMF then assigned their claims in the district court case here to Epicenter. (*Id.*) The operative second amended complaint, filed September 18, 2018, substituted in Epicenter as the only Plaintiff now in this litigation. (*Id.*)

meaningless by the district court's decision to ignore them and instead transplant the ICA's arbitration clause into the Note. This violated the "cardinal rule" of contract interpretation to avoid creating surplusage.

The district court erred when it found Epicenter's claims against Ganymede, as well as its claims against Burford, subject to arbitration based on the ICA's arbitration clause because the Note was the subject of the litigation. Epicenter now seeks de novo review of the district court's order granting Ganymede and Burford's motion to compel arbitration (the "Motion to Compel"), which resulted in Epicenter, in violation of its contractual and due process rights, being forced to arbitrate its claims in England before the LCIA.

At arbitration, Epicenter's due process rights were utterly trampled, as the LCIA arbitrators hid conflicts, ignored glaring evidentiary issues, forced Epicenter principal Bruce Gray to sign a £800,000 personal guaranty (the "Personal Guaranty") just to get in the door, and ultimately awarded Ganymede and Burford approximately $10 million in attorneys' fees and costs, as well as an anti-suit injunction. The district court's error in forcing this case into arbitration allowed these manifest injustices, including Mr. Gray's financial ruin.

Epicenter now respectfully asks that this Court reverse the district court and vacate the order compelling arbitration, which would in turn invalidate or nullify any attempt to enforce the arbitration award or Personal Guaranty. In the

alternative, Epicenter asks that this Court reverse the order compelling arbitration as to Burford, which was not a signatory to the Note.

## JURISDICTIONAL STATEMENT

After removal from the Superior Court of Arizona, Maricopa County, the United States District Court for the District of Arizona had jurisdiction over the subject matter of the action under 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds $75,000 exclusive of interest and costs, and because there is complete diversity of citizenship between the parties.

This Court has jurisdiction under 28 U.S.C. § 1291 because Epicenter appeals the final decision of the district court, which dismissed all of Epicenter's claims with prejudice. Although there had been an earlier dismissal (without prejudice) of Epicenter's case for purported delay in initiating arbitration (that was eventually reversed by this Court on appeal, with the matter then stayed again by the district court), the order granting the motion to compel was not ripe for review at that time because it was an interlocutory appeal that did not "merge" with the dismissal order. *See R & C Oilfield Servs. LLC v. Am. Wind Transp. Grp. LLC*, 45 F.4th 655, 661 (3d Cir. 2022) (holding that appellate court lacked jurisdiction to review appeal of motion to compel arbitration when case had been dismissed for failure to prosecute arbitration); *see also Al-Torki v. Kaempen*, 78 F.3d 1381, 1386 (9th Cir. 1996) (interlocutory orders not appealable after dismissal for failure to

prosecute); *Shannon v. Gen. Elec. Co.*, 186 F.3d 186, 192 (2d Cir. 1999) (holding court lacked appellate jurisdiction over interlocutory order because "interlocutory orders do not properly merge with a final judgment dismissing an action for failure to prosecute"); *Edge v. TLW Energy Servs., L.L.C.*, 2023 WL 3267847, at *4 (5th Cir. May 5, 2023) (collecting cases).

The district court's order of dismissal with prejudice was entered on January 9, 2024. Epicenter timely filed its Notice of Appeal on February 7, 2024. *See* Fed. R. App. P. 4(a)(1)(A).

## ISSUES PRESENTED FOR REVIEW

This appeal presents the following issues:

1. Did the district court err in compelling Epicenter to arbitrate based on an arbitration clause in an agreement different than the agreement that was the basis of Epicenter's underlying claims?

2. Did the district court err in compelling Epicenter to arbitrate its claims against Burford, absent any agreement to arbitrate between Epicenter or its predecessors and Burford?

3. Did the district court err in ruling that LCIA had authority to determine the arbitrability of claims in Epicenter's complaint against Ganymede and Burford based on a reference to LCIA in an agreement between Epicenter

and Ganymede that was not at issue in the complaint filed by Epicenter,

particularly given that the agreement at issue contained specific language

contemplating court proceedings?

## STATEMENT OF THE CASE

## I.  THE PARTIES AND THE PREDICATE FOR THIS LITIGATION

Appellant Epicenter is an Arizona LLC. Appellees are Burford, a foreign,

publicly listed, multi-billion-dollar litigation finance company organized under the

laws of Guernsey, and Ganymede, a closed-ended investment company organized

under the laws of Guernsey that is, upon information and belief, a single-asset shell

company controlled by Burford and created for the sole purpose of financing the

initial Arizona state court litigation that led to the dispute between these parties.

(*See* 3-ER-177.)

In 2009, Epicenter was engaged in unrelated real estate litigation and entered

into an agreement with Burford to obtain litigation financing. (1-ER-10; 3-ER-

177.) As alleged by Epicenter, Burford organized Ganymede as part of the

litigation financing deal, with this new entity set up to be a counterparty on

multiple financing agreements called Forward Purchasing Agreements ("FPAs")

executed between December 22, 2009, and April 22, 2013. (1-ER-10; 3-ER-178-

181.) The FPAs included arbitration provisions providing that claims "arising out

7

of or in connection with" the FPAs would be arbitrated before the LCIA in London. (1-ER-10.)

In May 2012, Epicenter settled the unrelated litigation after obtaining a large judgment. (1-ER-11.) As part of the settlement, Epicenter received valuable real property, but no cash. (*Id*.) After this settlement, the parties executed the last FPA on April 22, 2013, as well as the ICA. (*Id*.) The ICA concerned only a narrow issue: an agreement relating to the subordination of certain outstanding legal fees due to Simpson Thacher & Bartlett, LLP ("Simpson Thacher"), the law firm that had represented GMF and EPL in the underlying Arizona real estate suit. (3-ER-313.) This Intercreditor Agreement was the only one of the six documents at issue that included Simpson Thacher as a party; the rest involved only Ganymede, EPL, and GMF. (*Compare* 3-ER-313 *with* 3-ER-194, 209; 3-ER-228, 243; 3-ER-263, 276; 3-ER-292; 2-ER-137.)

Like the FPAs, the ICA contained an arbitration provision, which stated that "[a]ny dispute, controversy or claim arising out of or in connection with this Agreement shall (to the exclusion of any other forum) be referred to and finally resolved by arbitration under the Arbitration Rules of" the LCIA. (3-ER-333.)

The same day, EPL and GMF executed the Note in favor of Ganymede to liquidate the amount that Epicenter owed under the financing agreement. (1-ER-11.) The Note did *not* contain an arbitration agreement. (*Id*; *see also* 2-ER-136-

139.) In fact, the Note directly referenced "court proceedings" and clarified that in the event attorneys' fees were awarded at trial, "court costs and attorneys' fees shall be set by the court and not by the jury[.]" (2-ER-137.) Following execution of the Note, Burford and Ganymede began marketing the Note in an effort to sell it. (3-ER-182.)

In 2015, rather than wait until the Note's maturity date or any default, and while EPL and GMF were still engaged in efforts to sell assets secured by the Note, Burford and Ganymede began to aggressively publicly market the Note (without notifying Epicenter) at a nearly 50 percent discount from face value. (1-ER-11; 3-ER-182.) Burford and Ganymede knew that offering the Note well below face value would signal to parties interested in any transaction with EPL and GMF that they were in financial distress, and it would effectively bar them from any transaction to sell or refinance the Note–in essence, Burford and Ganymede had cut EPL and GMF off at the knees. (3-ER-182.) Because of Ganymede's and Burford's broadcast, no reasonable buyer would have entered into a refinancing transaction with EPL or GMF because of the perceived risk of default. (*Id*.)

## II. EPL AND GLF FILE SUIT AGAINST BURFORD AND GANYMEDE FOR BREACH OF IMPLIED COVENANT AND TORTIOUS INTERFERENCE

EPL and GMF originally filed this action in the Superior Court of the State of Arizona for the County of Maricopa, Case No. CV2018-007464, in May 2018,

9

asserting three counts: declaratory judgment, breach of the duty of good faith and fair dealing, and tortious interference with prospective business expectancy (with the last cause of action against Burford only). (3-ER-167; 3-ER-188.)[2] Burford and Ganymede removed the case to federal court.[3] (3-ER-166-174.)

Burford and Ganymede also filed a Rule 12(b)(1) Motion to Compel Arbitration Pursuant to the Federal Arbitration Act, and to Dismiss or Stay This Litigation (the "Motion to Compel"), seeking to compel arbitration and to dismiss or, alternatively, stay the litigation pending arbitration. (2-ER-140-164.) The Motion to Compel harped on supposed federal policy favoring arbitration, citing what it described as an "emphatic federal policy in favor of arbitral dispute resolution[.]" (*see* 2-ER-147.) This misleading characterization of a federal

---

[2] EPL and GMF each filed for bankruptcy in May 2016, after which their liquidating trustee, R.O.I. Properties, LLC ("ROI"), was authorized by the Bankruptcy Court to pursue claims on behalf of EPL and GMF. (1-ER-9.) In August 2018, the Bankruptcy Court approved a settlement, which transferred the claims ROI had brought to EPL and GMF. (*Id.*) EPL and GMF then assigned their claims in the district court case here to Epicenter. (*Id.*) The operative second amended complaint, filed September 18, 2018, substituted in Epicenter as the only Plaintiff now in this litigation. (*Id.*)

[3] Burford and Ganymede argued that removal was "appropriate under 9 U.S.C. § 205 because the subject matter of this proceeding 'relates to an arbitration agreement or award falling under' the Convention on the Recognition and Enforcement of Foreign Arbitral Awards," and because the district court had "subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because this is a civil action between citizens of different states and the amount in controversy exceeds $75,000." (3-ER-168.)

preference for arbitration appeared to sway the district court, which noted in its order granting the Motion to Compel that it would "giv[e] due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration." (1-ER-12) (quoting *Wagner v. Stratton Oakmont, Inc.,* 83 F.3d 1046, 1049 (9th Cir. 1996)).

Epicenter strenuously opposed the Motion to Compel, arguing that the Note intentionally did not include an arbitration clause (and in fact directly referenced court costs and attorneys' fees being decided by a judge and not a jury), the claims at issue arose outside of and were not subject to the ICA, and that nonsignatory Burford could not invoke the ICA's arbitration clause. (*See* 2-ER-126-131.)

## III. THE DISTRICT COURT COMPELS ARBITRATION

On January 14, 2019, although the district court acknowledged that the Note did not contain an arbitration clause, the court granted the Motion to Compel (the "January 14 Order"). (1-ER-20.) As a threshold matter, the court noted that "[a]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." (1-ER-12) (internal citations omitted). The court went on: "Absent unmistakably clear language to the contrary, arbitration should be ordered unless it can be said that the arbitration provision is not susceptible of an interpretation that

11

covers the asserted dispute." (1-ER-13 (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).)

Although the action arose from the Note and was not subject to the ICA, the court applied the ICA's arbitration clause. (1-ER-14.) The court did not address or try to reconcile the language in the Note referencing "court proceedings" stating that in the event attorneys' fees were awarded at trial, "court costs and attorneys' fees shall be set by the court and not by the jury[.]" (*See* 2-ER-137.) Nor did the court respond to Epicenter's argument that grafting an inconsistent arbitration provision into the Note would render this language surplusage. (*See* 2-ER-128.)

Instead, the district court seized on the single line in the Note which said that it was "subject to" the arrangement of the ICA. The district court overlooked, however, that the ICA was a distinct and narrow agreement, covering only EPL's and GMF's payment of legal fees to Simpson Thacher. (*See* 1-ER-14.)

The district court also punted the consideration of what claims were subject to the arbitration provision to the LCIA based again on a reference to LCIA in the ICA. (1-ER-17.) The Note does not mention LCIA or any dispute resolution mechanism other than court proceedings. Because that issue was delegated to the LCIA, which unsurprisingly provides that it should adjudicate arbitrability (which is how LCIA, a for-profit entity, makes money), the court ordered the matter stayed pending the outcome of the arbitration. (1-ER-20.)

12

## IV. THE DISTRICT COURT DISMISSES WITHOUT PREJUDICE AND THIS COURT REVERSES THE DISMISSAL

At the district court's request, the parties submitted periodic status reports to on the status of arbitration while the matter was stayed. (2-ER-99.) In August of 2019, the district court issued an order requiring Epicenter to show cause why the court should not dismiss this matter for failing to commence arbitration. In response, Epicenter reported to the district court that it had been "working diligently to obtain the necessary funding to proceed with the arbitration[.]" (2-ER-102.) As Epicenter's principal Bruce Gray explained in a declaration submitted along with the response to the order to show cause, the LCIA arbitration deposit was several hundred thousand dollars, and he had been informed by his prior counsel that the cost of the arbitration before the LCIA was anticipated to exceed $1 million. (2-ER-105.) In another update in January 2020, Epicenter represented that it was "on the verge of commencing the arbitration proceeding[.]" (2-ER-99.)

Nevertheless, on February 3, 2020, the district court issued an order (the "February 3 Order") that lifted its stay and *sua sponte* dismissed Epicenter's claims without prejudice. (2-ER-100.) The February 3 Order stated that Epicenter had not commenced the arbitration, and adopted specific language from Burford's and Ganymede's status report that "[Epicenter] has been saying that arbitration is imminent for a year, yet arbitration has yet to be commenced." (2-ER-99.) The

13

February 3 Order provided that due to Epicenter's supposed "failure to diligently commence arbitration," the stay in this matter no longer promoted judicial economy, and therefore, pursuant to the district court's inherent power to control its docket, the court lifted the stay order and dismissed Epicenter's claims without prejudice. (2-ER-100.)

Epicenter appealed the February 3 Order dismissing its claims. (2-ER-94.) On May 17, 2021, this Court reversed the district court's terminating sanctions, finding that the district court abused its discretion in dismissing the case because Epicenter had provided "reasonable explanations" for the delay in starting the arbitration, Burford and Ganymede failed to show prejudice, and the trial court failed to warn of dismissal or impose lesser sanctions prior to dismissal. (2-ER-96, 98.) Holding that the "record does not demonstrate that the district court's *sua sponte* dismissal order was appropriate here[,]" this Court remanded the case back to the district court for further proceedings. (2-ER-98.)

## V. ARBITRATION RESULTS IN AWARDS AGAINST EPICENTER AND IN DISMISSAL OF EPICENTER'S CASE

On June 11, 2021, the district court issued an order acknowledging that the suit was now back before the court based on this Court's reversal of the February 3 Order. (2-ER-92.) Following this Court's directive, the district court again stayed the matter pending arbitration. (*Id.*)

14

On January 16, arbitration before the LCIA in London commenced, concluding on February 1, 2023. (1-ER-4.) At the outset of arbitration, the LCIA panel required Epicenter's principal, Bruce Gray (not a party to the arbitration), to put up a staggering £800,000 *Personal Guaranty* to provide security for Burford's and Ganymede's costs in the arbitration. (Concurrently filed Request for Judicial Notice (the "RJN"), Ex. A.) Ganymede has since filed suit in Arizona state court to enforce that Personal Guaranty against Gray. (*Id.*)

On April 24, 2023, the LCIA issued a "Final Partial Award" that dismissed all of Epicenter's claims. (1-ER-4.) The Final Partial Award stated that a supplemental award would be forthcoming on account of Burford's and Ganymede's entitlement "to an anti-suit injunction with respect to the claims subject to this arbitration[.]" (*Id.*)

On August 21, 2023, Burford and Ganymede filed a Motion to Dismiss in the district court, arguing this matter should be terminated because the LCIA's Final Partial Award resolved Epicenter's claims, and any other supplemental awards would not impact the outcome of litigation because they related entirely to Burford's and Ganymede's counterclaims. (1-ER-2.)

Before the lower court ruled on the Motion to Dismiss, the LCIA issued its Final Award on December 11, 2023, which included an anti-suit injunction and

15

approximately $10 million in attorneys' fees and other compensation awarded to Ganymede and Burford. (2-ER-63-65.)

Epicenter contested the Motion to Dismiss, arguing, among other things, that the LCIA proceeding had been unfairly tainted by undisclosed conflict and bias. (2-ER-73.) In particular, Epicenter raised concerns that Burford's status as the "world's largest and most powerful funder of international arbitration" unduly influenced proceedings at the LCIA. (2-ER-77.) Burford is undoubtedly an "indispensable source of revenue" for the LCIA, which nevertheless undertook the arbitration as a purported neutral without making any disclosures to Epicenter about its extensive business ties with Burford. (*Id*.) The district court did not address Epicenter's concerns regarding Burford's influence on the LCIA[4]: on January 9, 2024, the court determined that it did not have jurisdiction to hear a dispute regarding the validity of the LCIA award and dismissed Epicenter's claims with prejudice. (1-ER-6, 8.) Epicenter timely initiated its appeal to this Court on February 7, 2024. (3-ER-358.)

---

[4] Another troubling development that amplified Epicenter's concerns of LCIA bias and undisclosed conflict emerged in August 2024 (months after Epicenter already initiated this appeal), when a judge of the English Commercial Court admonished Dame Elizabeth Gloster, one of three arbitrators on the LCIA panel in this case, for failing to make adequate conflicts disclosures in a different arbitration, resulting in "substantial injustice" in an award. (RJN, Ex. B.)

## SUMMARY OF ARGUMENT

In granting the Motion to Compel, the district court made at least four critical legal errors, all warranting reversal. First, as a threshold matter, the district court applied an erroneous supposed policy favoring arbitration as it interpreted the contract provisions. That interpretation was wrong, as the Supreme Court and this Court have repeatedly made clear. The district court's interpretation was tainted by reliance on this incorrect view of federal policy toward arbitration. This Court should right the scale and interpret the contractual provisions without favoring one party's desire to force arbitration over the other party's right to have its case litigated in court.

Second, the district court's conclusory January 14 Order failed to read the Note in context and did not give proper consideration to the intent of the sophisticated parties that drafted that agreement. In total, the parties executed six separate agreements related to litigation financing: four FPAs, the ICA, and the Note. Five of those documents have thorough arbitration clauses; the Note does not even mention the word "arbitration." Instead, it plainly contemplated potential litigation in court, with one section clarifying that "[i]n the event of any court proceedings, court costs and attorneys' fees shall be set by the court and not by the jury[.]" (2-ER-137.) Had these sophisticated parties wished to arbitrate disputes

17

arising from the Note, they surely would have included an arbitration clause as they had done with the rest of their contracts.

Third, the district court violated one of the "cardinal rules" of contract interpretation under Arizona law: avoiding an interpretation that renders a provision "meaningless." Not only is there *no* arbitration agreement or requirement in the Note, in fact, it contains a specific provision clarifying that a court, not a jury, would set court costs and attorneys' fees in the event of litigation. Accordingly, the Note contemplated court proceedings in the event of a dispute, not a private arbitration in London. If these sophisticated parties meant for Note-related claims to be arbitrated, why would they have included this paragraph relating to a jury and court proceedings? The January 14 Order is conspicuously silent and does not even attempt to square that circle.

And finally, as recently instructed by the Supreme Court in *Coinbase Inc. v. Suski*, the district court did not apply the proper analysis when deciding whether the court or the LCIA panel should determine the arbitrability of Epicenter's claims. *Coinbase* leaves no doubt that, because the ICA and the Note conflict with respect to dispute resolution provisions, the Court should not have delegated the question of arbitrability to the LCIA.

In sum, the district court misread and misinterpreted the Note, and its decision to force Epicenter into arbitration at the LCIA in London should be

reversed so that Epicenter can proceed with its claims again in federal court in Arizona. At a minimum, Burford, a nonsignatory to any agreement to arbitrate with Epicenter or its predecessors, should not have been permitted to compel arbitration. The Court should also clarify that any attempt by Burford or Ganymede to enforce the LCIA arbitration award or the Personal Guaranty would be null and void.

## STANDARD OF REVIEW

The district court's decision to grant a motion to compel arbitration is reviewed de novo. *See SEIU Local 121RN v. Los Robles Reg'l Medm Ctr*., 976 F.3d 849, 852 (9th Cir. 2020); *see also Wolsey, Ltd. v. Foodmaker, Inc*., 144 F.3d 1205, 1211 (9th Cir. 1998) (noting that "courts review de novo the meaning of an agreement to arbitrate") (citing *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 474 (9th Cir. 1991)). A lower court's decision on "[t]he interpretation and meaning of contract provisions" is reviewed de novo. *Milenbach v. Comm'r of Internal Revenue*, 318 F.3d 924, 930 (9th Cir. 2003); *see also Kassbaum v. Steppenwolf Prods., Inc.*, 236 F.3d 487, 490 (9th Cir. 2000) ("Contract interpretation is a question of law we review de novo.").

De novo review means that the Court views the case from the same position as the district court and as if no decision previously had been entered. *See Lawrence v. Dep't of the Interior*, 525 F.3d 916, 920 (9th Cir. 2008); *Freeman v. DirecTV, Inc*., 457 F.3d 1001, 1004 (9th Cir. 2006). Absolutely no deference is

19

given to the trial court's ruling. *See Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991).

## ARGUMENT

### I. The District Court Erred in Granting the Motion to Compel Arbitration

This Court has already found that the district court here abused its discretion once in dismissing Epicenter's claims. (2-ER-98.) The district court erred again in barring its doors to Epicenter's claims and instead forcing arbitration in London. This time, however, this Court need not defer to the district court's discretion; the January 14 Order's reasoning on the applicability of the ICA's arbitration clause to Epicenter's claims is entitled to no weight. *See SEIU Local 121RN*, 976 F.3d at 852. The district court's order was legally erroneous and should be reversed, for all the reasons discussed below.

### A. <u>In Granting the Motion to Compel, the District Court Erroneously Applied a Supposed Policy Favoring Arbitration That the Supreme Court Recently Clarified Was Not Appropriate</u>

In granting the Motion to Compel, the district court adopted Burford's and Ganymede's argument that the Note requires arbitration–notwithstanding that it indisputably contains *no* arbitration provision–in part because of a federal policy "in favor of arbitration." (1-ER-12.) However, since the time of the district court's order, there has been important clarification from the Supreme Court on what that

20

federal policy has *actually* meant ever since the FAA was enacted one hundred years ago.

The Supreme Court again explicitly ruled that the "federal policy is about treating arbitration contracts like all others, *not about fostering arbitration*." *Morgan v. Sundance, Inc*., 596 U.S. 411, 418 (2022) (emphasis added.) Accordingly, "a court may not devise novel rules to favor arbitration over litigation." *Id.* The *Morgan* court considered and rejected a "bespoke rule of waiver for arbitration" that had developed in the Eighth Circuit, which was designed to favor arbitration. *Id.* at 417. The Supreme Court explained that the Eighth Circuit's "bespoke rule" erroneously "derives from a decades old Second Circuit decision, which in turn grounded the rule in the FAA's policy." *Id.* (citing *Carcich*, 389 F.2d at 696).

In fact, the policy "favoring" arbitration was a *remedial* policy that "is merely an acknowledgment of the FAA's commitment to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts." *Granite Rock Co. v. Int'l Bhd. of Teamsters,* 561 U.S. 287, 302 (2010) (internal quotation marks omitted); *see also Rent-A-Ctr. W, Inc. v. Jackson*, 561 U.S. 63, 67 (2010). This policy was never meant to tip the scales toward arbitration, but rather to give the same effect to arbitration agreements as that of any other contract. Such a remedial policy was

21

originally necessary because, as the Supreme Court explained in *Epic Systems Corp. v. Lewis*, "Congress adopted the Arbitration Act in 1925 in response to a perception that courts were unduly hostile to arbitration. No doubt there was much to that perception. Before 1925, English and American common law courts routinely refused to enforce agreements to arbitrate disputes." 584 U.S. 497, 505 (2018) (citing *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 510 n.4 (1974)).

In *Scherk*, the Supreme Court discussed the FAA's legislative history, explaining that Congress passed the statute to "revers[e] centuries of judicial hostility to arbitration agreements[.]" 417 U.S. at 510. In so doing, Congress never meant to elevate arbitration as a preferred method of dispute resolution, but rather only "to place arbitration agreements 'upon the same footing as other contracts[.]'" *Scherk*, 417 U.S. at 511, (quoting H. R. Rep. No.96, 68th Cong., 1st Sess., 1, 2 (1924)). As such, the policy "favoring" arbitration that the district court misinterpreted here only ever meant that "Congress directed courts to abandon their hostility and instead treat arbitration agreements as 'valid, irrevocable, and enforceable.'" *Epic Sys. Corp.*, 584 U.S. at 505 (quoting 9 U.S.C. § 2).

Many courts have understood and applied this longstanding policy properly for decades. *See Nat'l Found. For Cancer Research v. A.G. Edwards & Sons, Inc.*, 821 F.2d 772, 774 (D.C. Cir. 1987) ("The Supreme Court has made clear" that the FAA's policy "is based upon the enforcement of contract, rather than a preference

22

for arbitration as an alternative dispute resolution mechanism") (citing *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218-24 (1985)).

Nevertheless, certain lower courts (like the district court here) continued to misapply that policy and show bias toward arbitration, prompting the Supreme Court's clarifying *Morgan* opinion. In the wake of *Morgan*, this Court has emphasized that "[n]o longer is there a 'special' rule favoring arbitration," and "we recognize that there is no longer a thumb on the scale in favor of arbitration." *Armstrong*, 59 F.4th at 1014.

*Morgan* and *Armstrong* make clear that the district court's January 14 Order compelling arbitration was incorrectly decided with a thumb on the scale in favor of arbitration. The result was that the district court improperly foisted the arbitration language from the ICA into the Note, which, as the district court itself conceded, contained *no* arbitration provision. (*See* 1-ER-11.)

Other courts in this Circuit have followed the sound reasoning articulated by *Morgan* and *Armstrong* in treating arbitration agreements like any other contract. *See, e.g.*, *Bombardier Transp. (Holdings) USA Inc. v. HDR Eng'g Inc.*, 2022 WL 17811661, at *2 n.1 (D. Ariz. Dec. 19, 2022) (rejecting party's argument that waiver question must be considered in light of "strong federal policy in favor of enforcement of arbitration agreements" as "inconsistent with the Supreme Court's recent holding in *Morgan v. Sundance, Inc.*"); *Gregory v. Armstrong*, 2023 WL

23

11983324, at *8 (9th Cir. Nov. 28, 2023) (citing *Morgan* and holding that parties

arguing waiver of an arbitration agreement do not have a "heavy" burden, but

instead "the burden is the same as in any contractual context"); *Maher v. Wells*

*Fargo Clearing Servs., LLC*, 2023 WL 11053622, at *3 (C.D. Cal. Dec. 12, 2023)

(correctly applying the FAA policy aimed at ending courts' historic hostility

toward arbitration agreements with the corollary policy of treating them like any

other garden-variety contract); *Snader v. JNR, Inc.*, 2023 WL 11108003, at *3

(C.D. Cal. Aug. 17, 2023) (same, and denying motion to compel arbitration);

*Gabourel v. Luxottica of Am.*, 2023 WL 3050987, at *3 (C.D. Cal. Jan. 27, 2023).

The LCIA arbitration endured by Epicenter illustrates why the Supreme

Court has urged lower courts not to favor arbitration over other methods of dispute

resolution. Arbitration lacks many of the key due process safeguards afforded to

litigants in court. Also, arbitration is privately funded and can be subject to bias

(actual or perceived), particularly when parties like Burford repeatedly patronize

certain arbitral organizations. The Supreme Court has long held that "to perform its

function in the best way 'justice must satisfy the appearance of justice.'" *In re*

*Murchison*, 349 U.S. 133, 136 (1955) (quoting *Offutt v. United States*, 348 U.S. 11,

14 (1954).

The district court's application of a supposed policy that has been repeatedly

disapproved by the Supreme Court for decades necessitates reversal. This Court

24

should balance the scale and protect the rights of litigants to a fair process, not one that forces overseas arbitration onto a party that never agreed to it.

**B. The Note Does Not Include an Arbitration Provision, and the District Court's Decision to Improperly Graft One into That Agreement Constitutes Reversible Error**

Federal courts apply state law principles governing contract formation when analyzing whether parties agreed to arbitration. *Gray v. GC Servs., LP*, 256 Ariz. 480, 484 (2023) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). In Arizona, courts are to "consider a provision's meaning in the context of the entire contract." *Terrell v. Torres*, 248 Ariz. 47, 50 (2020). In doing so, the "'primary and ultimate purpose of interpretation' is to discover [the parties'] intent and to make it effective." *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 152 (1993).

Here, the district court's January 14 Order focused on a single decontextualized fragment of the Note, which simply held that the Note (a document contemplating payment from ELR and GMF to Ganymede) was "subject to" the arrangement of the ICA, which covered EPL's and GMF's payment of legal fees to Simpson Thacher. (*See* 1-ER-14.) These were patently two separate agreements covering different financial arrangements, each with their own discrete dispute resolution terms.

25

The court failed to read the document as a whole and, in so doing, gave short shrift to the parties' actual intent. *See LeBaron v. Crismon*, 100 Ariz. 206, 209 (1966) ("It is the duty of the court to adopt a reasonable interpretation of a contract which will harmonize all of its provisions and any conflicting provisions on the face of the instrument must be reconciled if possible to meet the purposes for which the contract was intended.") (citations omitted).

*All four* of the FPAs *and* the ICA each have thorough arbitration clauses; the Note, on the other hand, is completely silent as to arbitration and instead contemplates court litigation. (3-ER-207; 3-ER-241; 3-ER-275; 3-ER-301; 3-ER-333; 2-ER-136-139.) Indeed, the district court noted in the January 14 Order that the Note "did not contain an arbitration provisions (sic)." (1-ER-11.) When, as here, "only one of two allegedly interrelated agreements contains an arbitration provision, there is an 'intent to treat [the agreement without the clause] differently,' than the agreement with the arbitration provision." *Big Picture Grp. LLC v. Pate*, 2014 WL 12567171, at *6 (C.D. Cal. June 17, 2014) (quoting *Int'l Ambassador Programs, Inc. v. Archexpo*, 68 F.3d 337, 340 (9th Cir. 1995)).

The parties' decision to adopt separate dispute resolution methods for the ICA and the Note made sense, given that the agreements covered totally separate arrangements. The ICA clarified the rights and obligations between creditors Simpson Thacher and Ganymede with respect to amounts owed for legal fees and

litigation funding, respectively. In contrast, the Note concerned only a promise by Epicenter to pay Ganymede. The claims at issue in Epicenter's suit relate strictly to Burford's and Ganymede's misconduct in prematurely marketing the Note.

If these sophisticated parties had wanted Note-related claims to be arbitrated abroad, they undoubtedly would have included a clear arbitration provision in the Note itself to clarify their intent and avoid any doubt as to the resolution of Note-related disputes. Indeed, they did exactly that with *each* of the four FPAs and the ICA. (3-ER-207; 3-ER-241; 3-ER-275; 3-ER-301; 3-ER-333.) The Note's utter silence on arbitration speaks volumes, and that should have been the end of the inquiry. The Note does not require arbitration.

Following a mistaken presumption in favor of arbitration, the district court concluded that the arbitration provision in the ICA should be incorporated into the Note. (1-ER-14.) The district court's determination that the Note incorporated the ICA's arbitration term is premised on a single, general reference in the Note's preamble that the Note was "subject to" the ICA. (*Id*.) After that general "subject to" language noted in the January 14 Order, the Note actually goes on to clarify that "[e]ach *holder* of this instrument, by its acceptance hereof, irrevocably agrees to be bound by the provisions of the Intercreditor Agreement." (2-ER-136.)[5]

---

[5] Of course, Epicenter does not dispute that it was also bound by the ICA, which its assignees had signed. But its agreement reflected in the Note features its own terms. Separately, upon satisfaction of the Note, the disbursement of related funds

(emphasis added). As defined in the Note, *Ganymede*, not Epicenter, is the holder of the Note. (*Id.*; *see also* Ariz. Rev. Stat. § 47-1201.21(a) (holder of a promissory note as the "person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession")). *Ganymede*'s rights and obligations are subject to the ICA, not Epicenter's. *See Norman v. Recreation Ctrs. of Sun City, Inc.*, 156 Ariz. 425, 428 (1988) ("Where there is an inconsistency between two provisions in a contract, we will construe the more specific provision to qualify the more general provision.").

The district court dismissed this issue with one short, conclusory paragraph in the January 14 Order, stating that "because the Note specifically provides that it is 'subject to' the Intercreditor Agreement, the Court finds that the Note incorporates the Intercreditor Agreement, which includes its arbitration provision." (1-ER-14.) However, none of the cases cited by either Burford and Ganymede or the January 14 Order support the extreme proposition that a single reference to one contract being "subject to" the other entirely incorporates the latter's arbitration agreement.

---

was to be governed by the ICA. The ICA was not intended to supplant material terms of the Note; instead, those agreements worked in tandem, with each contemplating different dispute resolution mechanisms.

In *Weatherguard Roofing Co., Inc. v. D.R. Ward Construction Co., Inc.*, the court held that a subcontractor had incorporated a general contractor's arbitration agreement with a client. 214 Ariz. 344, 347 (Ariz. Ct. App. 2007). However, the subcontract in *Weatherguard Roofing* contained a detailed, thorough recitation of the rights and duties of the subcontractor, including a clarification that the "[s]ubcontractor shall assume and agree to perform all obligations of Contractor in the General Contract, and any amendments thereof, insofar as they pertain to the Work, and Subcontractor shall assume toward Contractor all of the obligations and responsibilities which Contractor assumes toward Owner under the General Contract." *Id*. The Note, in contrast, only specifically binds its "holder"— Ganymede—to be "bound by provisions of" the ICA. (2-ER-136.)

Given the fundamental rights at issue, the district court should have more closely analyzed the language of the different agreements, which show that the Note's references to the ICA do not warrant a wholesale abandonment of Epicenter's separate rights arising specifically from the Note; this is particularly true as to Epicenter's claims against nonsignatory Burford.

Given this discrepancy in the "subject to" language, the ICA's arbitration agreement was not "clearly and unambiguously" incorporated by reference, which is required when, as here, the referenced document was not attached to the Note. *See United Cal. Bank v. Prudential Ins. Co. of Am.*, 140 Ariz. 238, 268 (1983). To

29

the extent these discrepancies created any ambiguity about the incorporation of the ICA, that inquiry was "subject to a factual determination concerning the intent of the parties and is to be resolved conclusively by the trier of fact[.]" *Id.* at 260. Here, the trier of fact should have been the jury, and it was error for the district court to resolve that factual dispute in broadbrush fashion on a Rule 12 motion.

The district court seems to have been persuaded that the Note incorporated the ICA because they were "executed simultaneously." (1-ER-14.) That fact does not support the court's analysis. *See Big Picture Grp.*, 2014 WL 12567171, at *6 ("simply because two agreements are executed as part of the same business transaction and at or about the same time does not mean that the arbitration clause in one agreement is incorporated into the other.") (citing *Rosenblum v. Tevelbyus.com Ltd.*, 299 F.3d 657 (7th Cir. 2002)). To the contrary, the fact that they were executed at the same time is all the more reason to believe that the decision to include an arbitration agreement in one contract but not the other was knowing and intentional.

Amplifying that intent is the sophistication, experience, and previous conduct of the parties here: had they genuinely intended for Note-related disputes to be arbitrated, it stands to reason that they would have continued the practice of including a clear arbitration clause in the Note, as they had done in the ICA and the

*four* FPAs. (3-ER-207; 3-ER-241; 3-ER-275; 3-ER-301; 3-ER-333.) They did not,

evidencing their intent *not* to require Note-related disputes to be arbitrated.

## C.   The District Court's Incorporation of the ICA's Arbitration Clause into the Note Improperly Creates Superfluous Terms

In its decision to bar Epicenter from enforcing its rights in US courts, the

district court neglected to address the Note's references to "court costs and

attorneys' fees" that were to be "set by the court" in the event of Note-related

litigation. (2-ER-137.) Under the district court's view, the ICA's arbitration

provision governs the Note, which would render the whole paragraph concerning

attorneys' fees "set by the court" to be nothing more than a meaningless vestige.

Such a reading violates a fundamental legal maxim of contract interpretation,

which counsels against any interpretation of an agreement that would result in

meaningless clauses. *See Scholten v. Blackhawk Partners*, 184 Ariz. 326, 329

(1995) ("a contract should be construed to give effect to all its provisions and to

prevent any of the provisions from being rendered meaningless.") (citing *Norman*,

156 Ariz. at 428).

When interpreting contracts, courts employing Arizona law must "attempt to

reconcile and give effect to all terms of the contract to avoid any term being

rendered superfluous." *Terrell v. Torres*, 248 Ariz. 47, 50 (2020); *see also Equity

Income Partners, LP v. Chi. Title Ins. Co.*, 241 Ariz. 334, 339-40 (2017)

31

(explaining that interpretations of contracts that render certain provisions

"meaningless" should "be avoided under the basic rules of contract interpretation")

(citing *Goodman v. Newzona Inv. Co.*, 101 Ariz. 470, 473 (1966)). It is a "cardinal

rule of contract interpretation that we do not construe one term of a contract to

essentially render meaningless another term." *Aztar Corp. v. U. S. Fire Ins. Co.*,

223 Ariz. 463, 478 (2010); *see also Doran v. Oasis Printing House*, 24 Ariz. 475,

478 (1922) ("It is a cardinal rule in the construction of contracts to give meaning to

all the words and clauses used by the parties.").

Here, the Note specifically references "court proceeding" and clarifies that

attorneys' fees in litigation would be "set by the court and not by the jury." (2-ER-

137.) If the parties had intended to arbitrate disputes relating to the Note, it strains

credulity to think that they would make such clear references to contemplated court

proceedings in the agreement and that they would have completely omitted an

actual arbitration clause and would have instead relied on an attenuated and

qualified incorporation of another document.

Ganymede and Burford are about as sophisticated as they come in terms of

litigation financing agreements. Ganymede was formed for the sole purpose of

litigation funding. (3-ER-177.) Ganymede's parent, Burford is a global giant in the

litigation funding business; the firm funded almost a billion dollars' worth of

litigation alone in 2022 and its website boasts of a $5.8 billion portfolio with "more

than 1,000 commercial matters" funded. (2-ER-77.) These parties knew what they were doing when they drafted and executed the Note.[6] The Court should assume that every clause in the Note was reviewed extensively and that each word was carefully chosen and was meant to have effect. To do otherwise would result in the clauses related to court proceedings being mere surplusage, which violates and thwarts Arizona contract construction principles. *See, e.g., Terrell*, 248 Ariz. at 50.

Instead, the Note can in fact be read in harmony with the ICA while giving effect to the clause regarding court proceedings and attorneys' fees being decided by the court. Epicenter's claims here arise strictly from the Note itself—specifically from Burford's shopping of the Note before its maturity date, which formed the basis of Epicenter's lawsuit. (*See* 3-ER-188; 1-ER-11.) Epicenter's claims in the underlying action relate *strictly* to Note-related conduct; they do not implicate the ICA or its arbitration provision. (*See* 3-ER-188.) In fact, Epicenter's operative second amended complaint does not even *mention* the ICA at all. (*See* 3-ER-175-189.) The ICA concerned only a narrow issue: the subordination of legal fees owed to creditor Simpson Thacher (described as the "Subordinated Creditor" in that agreement), the law firm that had represented GMF and EPL in the underlying Arizona real estate suit. (3-ER-313.) The ICA was part of the overall

---

[6] Similarly, Paragraph 6 of the ICA states that it was "negotiated among business persons sophisticated in the area of business finance[.]" (3-ER-331.)

transaction to govern the allocation of proceeds from any disposition of assets (such as the Note). This is why the ICA included Simpson Thacher as a party; in contrast, the Note had nothing to do with Simpson Thacher or the order of creditor priority.

In the January 14 Order, the district court noted that if there were "a conflict between the [Note] and the Intercreditor Agreement, the Intercreditor Agreement shall control." (1-ER-11.) Here, there is no conflict: Epicenter's claims arise from the Note *only* and do not relate to the ICA, an agreement that only addresses the discrete issue of settling outstanding legal fees from the underlying litigation funded by Burford and Ganymede. There is simply no connection between the payment of Simpson Thacher's legal fees and Epicenter's causes of action stemming from Burford's public, premature shopping of the Note. As such, the ICA's arbitration provision is not implicated.

The parties' reference to court proceedings in the Note evinces clear intent that disputes related to the Note could and should proceed in court. (*See* 2-ER-137.) The district court's interpretation of the agreements shoehorns an arbitration provision into the Note where one does not exist, which renders the Note's clause on the determination of "court costs and attorneys' fees" entirely superfluous. This reading strikingly violates the "cardinal rule" of contract interpretation not to

34

"construe one term of a contract to essentially render meaningless another term."
*Aztar*, 223 Ariz. at 478. Breaking this "cardinal rule" merits reversal here.

## D.   The District Court Erred in Delegating the Arbitrability of Epicenter's Claims to the LCIA

In deciding the Motion to Compel, the district court improperly ceded its
role as a gatekeeper in deciding whether any of Epicenter's claims fell within the
scope of the ICA's arbitration provision. As the Supreme Court recently explained
in *Coinbase v. Suski*, the district court should not have punted on this issue because
of the conflicts in the ICA and the Note with respect to dispute resolution
procedures. Furthermore, the district court incorrectly determined that reference to
the LCIA Rules in the ICA amounted to "clear and unmistakable" evidence that the
parties intended to delegate the question of arbitrability of Note-related claims to
the LCIA panel.

Ordinarily, courts, not arbitrators, decide gateway issues like "whether the
parties have a valid arbitration agreement at all" or whether a particular arbitration
clause applies to a controversy. *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452
(2003); *see also Momot v. Mastro*, 652 F.3d 982, 986 (9th Cir. 2011). While
gateway issues can be expressly delegated to the arbitrator (*Brennan v. Opus Bank*,
796 F.3d 1125, 1130 (9th Cir. 2015)), "[c]ourts 'should not assume that the parties
agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that

they did so'" *Henry Schein v. Archer & White Sales*, 586 U.S. 63, 72 (2019)). Any ambiguities are resolved in favor of the court, not an arbitrator, deciding the question of arbitrability. *First Options of Chi.*, 514 U.S. at 945.

1.  **The Supreme Court's Recent *Coinbase* Decision Highlights the District Court's Error in Delegating the Question of Arbitrability to the LCIA**

In last year's *Coinbase* decision, the Supreme Court unanimously held that "where parties have agreed to *two* contracts—one sending arbitrability disputes to arbitration, and the other either explicitly or implicitly sending arbitrability disputes to the courts—a court must decide which contract governs." 602 U.S. 143, 152 (2024) (emphasis in original.) The first contract at issue in *Coinbase* included an arbitration agreement that delegated the question of arbitrability to an arbitrator. *Id.* at 146. The second "sweepstakes" contract at issue included a forum selection clause specifying that venue was proper in the courts. *Id.* at 146-47. The Court held that "the question whether these parties agreed to arbitrate arbitrability can be answered only by determining which contract applies," and that "[w]hen we home in on the conflict between the delegation clause in the first contract and forum selection clause in the second, the question is whether the parties agreed to send the given dispute to arbitration—and, per usual, *that* question *must be answered by a court.*" *Id.* at 150. (second emphasis added.) "To hold otherwise would be to

impermissibly elevate a delegation provision over other forms of contract." *Id.* at 144, 152.

As in *Coinbase*, the parties here executed multiple contracts. Epicenter's assignees admittedly assented to one agreement—the ICA—that contains an arbitration clause. However, like the "sweepstakes" agreement in *Coinbase*, the Note here contains an explicit reference to a suit in court, in the form of the provision explaining that a judge, not the jury, would fix the amount of attorneys' fees and court costs. Under the clear guidance from *Coinbase*, the conflict between the delegation clause in the ICA and the direct reference to court proceedings in Note leads to the inexorable conclusion that the determination of arbitrability is a question that "must be answered by a court" and *not* an arbitrator. 602 U.S. at 150.

Two district courts in this Circuit have recently applied *Coinbase* in analyzing the delegation question when parties have executed multiple conflicting contracts. Both cases are factually analogous and illustrate the mistake made by the district court here in delegating the "gateway" arbitrability question to the LCIA.

In *Mills v. ALA Management Services, Inc.*, an Arizona district court considered an employment and discrimination suit filed by a former teacher and basketball coach at a charter school. 2024 WL 4972003, at *1 (D. Ariz. Dec. 4, 2024). The *Mills* plaintiff signed multiple contracts with the school; his teaching contracts indisputably contained arbitration agreements (delegating arbitrability to

37

AAA), while his contract to coach basketball did not have an arbitration clause. *Id.*, at *5. The school attempted to send all claims to arbitration, "including those related to his coaching role." *Id.*, at *3. In its motion to compel arbitration, the school also argued that, since the teaching contracts delegated the gateway arbitrability question to AAA, the AAA arbitrator should determine whether the coaching-related claims were arbitrable. *Id.*, at *4. Applying *Coinbase*, the district court flatly rejected the school's argument, holding that the conflict between the separate teaching and coaching contracts meant that it was an inquiry for the court (not the AAA arbitrator) to determine "to what extent Mills' claims arise of his coaching role and those that pertain to his teaching role." *Id.*, at *5.

A district court in the Northern District of California considered a similar fact pattern just last month and reached the same conclusion as the *Mills* court. In *Oracle America, Inc. v. Procore Technologies, Inc.*, Oracle sued a former employee and his new employer (an Oracle competitor) for trade secret misappropriation. 2025 WL 1069892, *1 (N.D. Cal. April 9, 2025). The employee, Mariano, signed two agreements with Oracle when he was hired—an Employment Agreement and a Proprietary Information Agreement. *Id.* All parties agreed that the Employment Agreement had an arbitration provision, which incorporated JAMS and AAA rules that delegated arbitrability to the arbitrator. *Id.*, at *3. The Proprietary Information Agreement, however, included a venue provision

38

providing that disputes "involving Oracle which is any way connected with this agreement may be instituted in federal court in San Francisco or San Jose, California or state court in San Mateo County or Santa Clara County, California." *Id.*, at *1-2. Mariano moved to compel arbitration of the trade secret claims, arguing that the Employment Agreement required the arbitrator to determine the arbitrability of the trade secrets claims, as the two agreements he signed were really "one contract" that were "part of the same employment package." *Id.*, at *3. The district court disagreed, holding that Mariano's argument provided "no reason to deviate from *Coinbase.*" *Id.*

Explaining its holding, the *Oracle America* court stated it would "decide the arbitrability of Oracle's claims" because it "cannot conclude that the Employment Agreement's delegation of arbitrability operates to delegate to arbitration questions regarding the separate Proprietary Information Agreement." *Id.* Ultimately, the district court denied Mariano's motion to compel, reasoning that "the Proprietary Information Agreement's venue provision authorizes Oracle to bring claims related to misappropriation of its proprietary information in this Court rather than arbitration." *Id.*, at *6.[7]

---

[7] Burford and Ganymede may counter by citing two decisions interpreting *Coinbase* as requiring an express conflict over arbitration between two contracts, namely, *Cloney's Pharmacy, Inc. v. Wellpartner, Inc.*, 2024 WL 4349291 (S.D.N.Y. Sept. 30, 2024), and *In re Axos Bank Litigation*, 2024 WL 4195299 (S.D. Cal. Sept. 13, 2024). This Court should not be distracted by this argument.

39

*Coinbase* should be recognized as a bright-line rule that courts always decide, based on traditional contract principles, which contract is controlling when a party attempts to apply an arbitration provision in one contract to a dispute under a different contract that has no arbitration provision. Without such a rule, lower courts will need to guess what level of nexus is required between contracts for an arbitration agreement in one contract to apply to another contract. Here, the district court overreached in applying the ICA's latently incorporated delegation provision to Epicenter's claims which derived solely from the Note, an agreement that has no arbitration clause and directly references court proceedings.

## 2. There Was No "Clear and Unmistakable Evidence" of Agreement to Delegate the Question of Arbitrability to the LCIA

The district court's decision to punt the inquiry into the arbitrability of Epicenter's claims was yet another critical error that should result in reversal. As explained in *First Options of Chicago, Inc.,* "[c]ourts should not assume that the

---

Both cases incorrectly held that the presence of a venue selection clause in the second contract was necessary to *Coinbase*'s holding. Neither decision properly reckoned with the *Coinbase* Court's use of "implicitly" when it referred to "one [contract] sending arbitrability disputes to arbitration, and the other [contract] either explicitly *or implicitly* sending arbitrability disputes to the courts." *Coinbase*, 602 U.S. at 152 (emphasis added). The Justices no doubt added the word "implicitly" to encompass contracts that, like the Note, may not have explicit venue clauses but that directly reference court proceedings. After all, the second contract in *Coinbase* had an express venue clause, so the word "implicitly" must have been inserted with an eye to future disputes like this one. *See id*. at 146-47.

parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." 514 U.S. 938, 944 (1995) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643, 649 (1986)); *see also Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1127 (9th Cir. 2013) (refusing to delegate arbitrability question when the agreements in question "do not contain clear and unmistakable evidence that Plaintiffs and Toyota agreed to arbitrate arbitrability.") Under *First Options of Chicago*, and as emphasized recently in *Coinbase*, "ambiguity about the question 'who'" should decide arbitration, a court or an arbitrator, must be resolved in favor of judicial review. 514 U.S. at 945.[8]

There was no "clear and unmistakable evidence" of Epicenter's intent to delegate arbitrability of its Note-related claims. In fact, the evidence is to the contrary, as the Note contemplates court litigation. Yet with no analysis, the district court agreed with Ganymede's argument that the ICA's single reference to the LCIA Rules meant that the parties intended to delegate the arbitrability of Epicenter's Note-related claims to the LCIA. (1-ER-16.)

---

[8] "And, given the principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration, one can understand why courts might hesitate to interpret silence or ambiguity on the 'who should decide arbitrability' point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide." *First Options of Chi*, 514 U.S. at 945.

The facts here show anything *but* clear and convincing evidence of agreement on delegation: the Note itself has no arbitration agreement. (2-ER-136-139.) The ICA's arbitration provision comes into play only if we accept that Epicenter understood that it would be sending all of its Note-related claims to arbitration based solely on the Note's mention of Ganymede's rights and obligations under the Note being "subject to" the ICA. And even *then*, delegation is not mentioned at *all*; it is only silently incorporated because the ICA's arbitration agreement entirely incorporates the dozens of pages of LCIA rules by reference. (1-ER-16.) It strains credulity to characterize this byzantine process of double incorporation as "clear and unmistakable evidence" of Epicenter's intent with respect to the question of delegation of arbitrability.

The district court cited multiple cases, including *Innospec Ltd. v. Ethyl Corp.*, 2014 WL 5460413 (E.D. Va. Oct. 27, 2014), to support its finding that the parties delegated this gateway question to the LCIA. (1-ER-17.) However, these cases differ in a key respect. Unlike here, where the parties dispute whether the Note includes an arbitration agreement by reference to the ICA, in *Innospec* there was no dispute about whether there was an agreement to arbitrate in place. The parties quarreled only about whether incorporation of the LCIA's rules in general sufficed to delegate arbitrability to the LCIA panel. *Innospec*, 2014 WL 5460413, at *4. On that narrow set of facts, the *Innospec* court found delegation by

42

incorporation proper because "the parties clearly and unmistakably agreed to arbitration under the LCIA Rules." *Id*.; *see also Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1073 (9th Cir. 2013.) Such is clearly not the case here, as Epicenter vigorously disputes whether an arbitration agreement even controls at all. The district court did not appropriately apply the "clear and unmistakable evidence" standard here, which merits reversal. *See Peabody Holding Co., LLC v. United Mine Workers of Am., Int'l Union*, 665 F.3d 96, 102 (4th Cir. 2012) (holding that "the 'clear and unmistakable' standard is exacting"); *Mitchell v. Wells Fargo Bank*, 280 F. Supp. 1261, 1287 (D. Utah 2017) (same).

### 3. As a Nonsignatory to the ICA, Burford Could Not Enforce the Delegation Provision

Even assuming the district court could have properly delegated the arbitrability of the claims against Ganymede to the LCIA, it still committed error in allowing Burford to enforce the ICA's incorporated delegation provision. Following *Kramer*, courts in the Ninth Circuit have held that delegation of arbitrability with respect to nonsignatories must be explicit. Broad incorporation of the LCIA rules, for example, does not afford nonsignatories the right to enforce the delegation clause. In *Young v. Bytedance Inc.*, for example, the contract at issue incorporated JAMS Rules. 700 F. Supp. 3d 808, 810. (N.D. Cal. 2023) The nonsignatory defendant in *Young*, who was seeking to enforce an arbitration agreement on equitable estoppel grounds, argued that it should be able to enforce

the agreement's delegation provision as well because "it uses general language that does not limit itself to [Plaintiff] and [Plaintiff's employer]" and "incorporation of the JAMS rules, which provide that 'disputes' over 'who are proper Parties to the Arbitration' are also arbitrable. *Id*. at 811, 812 n.6. The district court rejected that argument:

> [Defendant] is not asserting that it actually entered an agreement with [Plaintiff] to arbitrate, or that it is a third-party beneficiary of the arbitration agreement . . . And a delegation provision can be invoked only if the parties to the dispute agreed that their disagreement about arbitrability would be decided by the arbitrator . . . So even if [Defendant] has a good argument for compelling [Plaintiff] to arbitration on equitable estoppel grounds, it cannot invoke the delegation provision to have that issue decided by an arbitrator. Indeed, *it's not clear how a nonparty to an arbitration agreement could ever invoke a delegation provision* when seeking to compel arbitration based only on equitable estoppel.

*Id.* at 812-13. (emphasis added).

The district court thus should not have permitted Burford to piggyback onto the purported incorporation of the LCIA Rules in the ICA. Such delegation could hardly be said to be "clear and unmistakable." It was error for the district court to delegate the inquiry of the arbitrability of the claims against nonsignatory Burford to the LCIA panel itself, and that error warrants reversal.

## E.  **The District Court Erred in Permitting Burford to Enforce the Arbitration Clause**

Even if this Court determines that the claims against Ganymede were properly sent to arbitration (and to be clear, they should not have been), it was still

44

error for the district court to permit Burford—a nonsignatory—to enforce the

ICA's arbitration clause.[9] The district court incorrectly determined, for example,

that with respect to the tortious interference claim, "Plaintiff's claims stem from

how Ganymede, not Burford, marketed and then sold the Note." (1-ER-19.) That

conclusion is starkly at odds with the pleading in the second amended complaint,

which provide that "Burford directed HFF to send the email 'blast' advertising the

Note for sale at a substantial discount." (3-ER-188.) The tortious interference claim

was brought *only* against Burford, as it had to be. An interference claim presumes a

third party. *See Wallace v. Casa Grande Union High Sch. Dist. No. 82 Bd. of

Governors*, 184 Ariz. 419, 427 (Ariz. Ct. App. 1995) (listing elements of tortious

interference claim, including "the existence of a valid contractual relationship or

business expectancy; the interferer's knowledge of the relationship or expectancy;

intentional interference inducing or causing a breach or termination of the

relationship or expectancy") Burford was that third party "interferer" here

("Burford was aware that Epicenter and Gray had a valid business expectancy") (3-

ER-188.) In fact, Ganymede is not mentioned at all in Count III of the second

---

[9] The district court also premised its decision to permit Burford to enforce arbitration in part on Epicenter's allegations that Ganymede was a "mere alter ego of Burford." (3-ER-188; 1-ER-19.) To be clear, those allegations were based on information and belief (*see* 3-ER-185), and there has been no finding of fact as to the corporate formalities of Burford or Ganymede sufficient to permit Burford to enforce arbitration here.

amended complaint. (3-ER-188-189.) Thus, Burford's conduct is not "intertwined" with Ganymede's for the purposes of the tortious interference claim. *See Sun Valley Ranch 308 Ltd. P'ship ex rel. Englewood Props., Inc. v. Robson*, 231 Ariz. 287, 297 (Ariz. Ct. App. 2012). At least with respect to the tortious interference claim as to Burford, the district court erred in forcing Epicenter to arbitration.

## II. The District Court's Error Resulted in an Improper $10 Million Award and Personal Guaranty, Which Should Not Be Enforceable

The district court's order creating an arbitration provision from thin air in the Note improperly forced Epicenter to litigate its claims in a costly, protracted foreign arbitration that may have been tainted by bias and undisclosed conflicts. That proceeding resulted in a large monetary award in favor of Burford. (2-ER-63-65.) Although neither Burford nor Ganymede has yet sought to enforce or domesticate the LCIA award in the United States, Ganymede has already filed suit in Arizona state court in an attempt to enforce the Personal Guaranty against Mr. Gray. (RJN, Ex. A.) Epicenter respectfully requests that, in the event of reversal, this Court's decision clarify that any such efforts to confirm the award or the Personal Guaranty must be null and void. *See Dees v. Billy*, 357 F. App'x 813, 816 (9th Cir. 2009) (vacating award after reversal of order granting motion to compel arbitration); *see also Turner v. Charter Commc'ns, LLC*, 2024 WL 4919512, at *2 (9th Cir. Nov. 29, 2024); *McArdle v. AT&T Mobility LLC*, 2017 WL 4354998, at

46

*6 (N.D. Cal. Oct. 2, 2017) (granting motion for reconsideration of order compelling arbitration, rescinding prior order granting motion to compel, and vacating arbitral award); *Wilson v. Kemper Corp. Servs. Inc.*, 134 F.4th 339, 348 (5th Cir. 2025) (holding that district court's lack of subject matter jurisdiction over the underlying dispute "vitiates its order compelling arbitration, the arbitration itself, and its confirmation of Defendants-Appellees' arbitral award") (citing *Lower Colo. River Auth. v. Papalote Creek II, LLC*, 858 F.3d 916, 927 (5th Cir. 2017)).

This dispute should never have been forced to arbitration in the first place, and Epicenter should have been permitted to proceed with its Note-related claims in the Arizona district court. Had the district court properly denied the Motion to Compel, the LCIA would never have been in a position to issue its award or require the Personal Guaranty. *See Scott v. Borg Warner Protective Servs.*, 55 F. App'x 414, 416 (9th Cir. 2003) (vacating award when arbitration was not enforceable under Hawaiian law and thus "the arbitrator lacked the authority to resolve" the claims presented). Without such a ruling, Epicenter may be put in the untenable position of proceeding in the district court on its claims, while also being exposed to enforcement action on the LCIA award and the Personal Guaranty. *See, e.g., Lower Colo. River Auth.*, 858 F.3d at 927 (vacating arbitration award that resulted from district court's "void order compelling Papalote to an arbitration that it should not have been forced to attend at the time.")

47

## CONCLUSION

For all of the foregoing reasons, Epicenter respectfully requests that this Court reverse the district court's rulings granting the Motion to Compel and the Motion to Dismiss. In the event of reversal, this Court should further declare that any enforcement, confirmation, or domestication action by Burford or Ganymede on the LCIA award is null and void. Similarly, Epicenter requests that the Court declare the Personal Guaranty, which was only procured through arbitration, null and void. The Court should remand this matter back to the district court for further proceedings consistent with its opinion.

DATED:  May 5, 2025        WAYMAKER LLP


By:  */s/ Ryan G. Baker*
     RYAN G. BAKER
     *Attorneys for Appellant Epicenter Loss*
     *Recovery, LLC*

48

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  24-721

I am the attorney or self-represented party.

**This brief contains**  11,337  **words,** including  0  words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  /s/ Ryan G. Baker    **Date**  May 5, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)**  | 24-721

The undersigned attorney or self-represented party states the following:

(●) I am unaware of any related cases currently pending in this court.

( ) I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

( ) I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | /s/ Ryan G. Baker          **Date** | May 5, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 17**                                         *New 12/01/2018*