# No. 24-721

# In The United States Court of Appeals for the Ninth Circuit

---

EPICENTER LOSS RECOVERY, LLC,

*Plaintiff-Appellant,*

v.

BURFORD CAPITAL LTD. and GANYMEDE INVESTMENTS LTD.,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the District of Arizona
Case No. 2:18-cv-03300-DJH
Hon. Diane J. Humetewa

---

## ANSWERING BRIEF OF DEFENDANTS-APPELLEES BURFORD CAPITAL LTD. AND GANYMEDE INVESTMENTS LTD.

Lauren Pardee Ruben
PERKINS COIE LLP
1900 16th St, Suite 1400
Denver, CO 80202

Michael R. Huston
 *Counsel of Record*
Shane R. Swindle
PERKINS COIE LLP
2525 E Camelback Rd, Suite 500
Phoenix, AZ 85016
Telephone: (602) 351-8000
mhuston@perkinscoie.com

*Counsel for Defendants-Appellees*

## Fed. R. App. P. 26.1 Disclosure Statement

Ganymede Investments Limited is a wholly owned indirect subsidiary of Burford Capital Limited. Burford Capital Limited has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

Date: July 7, 2025

> s/ Michael R. Huston
> Michael R. Huston
> PERKINS COIE LLP
> 2901 N Central Ave, Suite 2000
> Phoenix, AZ 85012
> Telephone: (602) 351-8000
> mhuston@perkinscoie.com

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................ 1

Jurisdictional Statement ................................................................... 4

Statement of the Issues ..................................................................... 4

Legal Background on the Convention ............................................. 5

Statement of the Case ....................................................................... 7

    A.    Factual Background .............................................................. 7

    B.    Procedural History ............................................................. 13

        1.    Epicenter files suit, which the district court stays pending the parties' agreed-upon arbitration. ........... 13

        2.    Epicenter concedes the arbitral tribunal's jurisdiction and the arbitrability of its claims. .......... 16

        3.    The parties invest substantial resources in a comprehensive arbitration proceeding. ...................... 19

        4.    The district court dismisses Epicenter's suit, and Epicenter appeals ...................................................... 21

Summary of Argument ..................................................................... 22

Standard of Review .......................................................................... 27

Argument ........................................................................................... 27

    A.    Only an English court could consider Epicenter's challenge to the arbitral tribunal's arbitration awards and requirement of a personal guaranty. ............................ 27

    B.    Epicenter has waived, and should be estopped from asserting, the arguments it presses on appeal. .................... 31

        1.    Epicenter waived its current arguments by intentionally relinquishing them. ............................... 32

        2.    Epicenter is estopped from asserting arguments contrary to those it advanced in arbitration ............... 34

# TABLE OF CONTENTS
## (CONTINUED)

Page

C.  Epicenter is bound to arbitration agreements subject to the Convention, and those agreements delegated all questions of arbitrability to the London Tribunal. ............... 37

    1.  The district court's decision rested on plain contract text, not any faulty presumption. .................. 37

    2.  Epicenter is bound by two arbitration agreements, which are incorporated into the Note. .................................................................. 38

    3.  The arbitration agreements delegated questions of arbitrability to the arbitral tribunal. ....................... 41

        a.  The parties' incorporation of the arbitral tribunal's rules is clear and unmistakable evidence of delegation. ......................................... 42

        b.  Epicenter is bound by the delegation clause, including on its claims against Burford. ............ 43

        c.  Epicenter's counterarguments are meritless. .... 47

D.  Epicenter's claims were within the scope of the arbitration provisions. ........................................ 53

    1.  Epicenter's claims against Ganymede were subject to arbitration. ................................................. 54

    2.  Epicenter's claims against Burford were subject to arbitration. ............................................... 57

Conclusion ................................................................ 62

Certificate of Service .............................................. 63

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aggarao* v. *MOL Ship Mgmt. Co.*,
    675 F.3d 355 (4th Cir. 2012)................................................................59

*Ali* v. *Fed. Bureau of Prisons*,
    552 U.S. 214 (2008) ........................................................................46

*Arthur Andersen LLP v. Carlisle*,
    556 U.S. 624 (2009) ........................................................................57

*Astra Oil Co.* v. *Rover Navigation, Ltd.*,
    344 F.3d 276 (2d Cir. 2003) ..............................................................59

*Balen* v. *Holland Am. Line Inc.*,
    583 F.3d 647 (9th Cir. 2009)..............................................................39

*Bonner* v. *Michigan Logistics Inc.*,
    250 F. Supp. 3d 388 (D. Ariz. 2017) ............................................58, 59

*Brittania-U Nigeria, Ltd.* v. *Chevron USA, Inc.*,
    866 F.3d 709 (5th Cir. 2017)........................................................44, 47

*Carr* v. *Liberty Life Assur. Co.*,
    390 F. App'x 694 (9th Cir. 2010) ........................................................35

*CD Partners, LLC* v. *Grizzle*,
    424 F.3d 795 (8th Cir. 2005)........................................................58, 59

*Coinbase, Inc.* v. *Suski*,
    602 U.S. 143 (2024)..................................41, 47, 48, 49, 50, 51

*Comedy Club, Inc.* v. *Improv W. Assocs.*,
    553 F.3d 1277 (9th Cir. 2009)............................................................13

# TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

*Compania de Inversiones Mercantiles S.A.* v. *Grupo Cementos de Chihuahua S.A.B. de C.V.*,
   58 F.4th 429 (10th Cir. 2023) ............................................ 38

*Contec Corp.* v. *Remote Solution, Co.*,
   398 F.3d 205 (2d Cir. 2005) ............................ 44, 45, 46, 47

*Corporacion AIC, SA* v. *Hidroelectrica Santa Rita S.A.*,
   66 F.4th 876 (11th Cir. 2023) ........................................ 28

*Edwards* v. *Vemma Nutrition*,
   No. 17-cv-02133, 2018 WL 637382 (D. Ariz. Jan. 31, 2018) .............. 40

*Escobal* v. *Celebration Cruise Operator, Inc.*,
   482 F. App'x 475 (11th Cir. 2012) ...................................... 61

*Esso Expl. & Prod. Nigeria Ltd.* v. *Nigerian Nat'l Petroleum Corp.*,
   40 F.4th 56 (2d Cir. 2022) .............................................. 6

*Flori Corp.* v. *Fitzgerald*,
   810 P.2d 599 (Ariz. Ct. App. 1990) .................................... 31

*GE Energy Power Conversion France SAS, Corp.* v. *Outokumpu Stainless USA, LLC*,
   590 U.S. 432 (2020) ............................................ 5, 6, 39, 57

*Green Enters., LLC* v. *Hiscox Syndicates Ltd. at Lloyds of London*,
   68 F.4th 662 (1st Cir. 2023) ............................................ 38

*Gulf Petro Trading Co.* v. *Nigerian Nat'l Petroleum Corp.*,
   512 F.3d 742 (5th Cir. 2008) .................................... 7, 28, 29

*Hawaiian Host, Inc.* v. *Citadel Pac. Ltd.*,
   637 F. Supp. 3d 1083 (D. Haw. 2022) .................................. 28

TABLE OF AUTHORITIES
(CONTINUED)

**Page(s)**

*Henry Schein, Inc.* v. *Archer & White Sales, Inc.*,
   586 U.S. 63 (2019) ........................................................ 38, 41

*Hill* v. *Xerox Bus. Servs., LLC*,
   59 F.4th 457 (9th Cir. 2023) ............................................... 33

*Holley-Gallegly* v. *TA Operating, LLC*,
   74 F.4th 997 (9th Cir. 2023) ............................................... 27

*Hughes Masonry Co.* v. *Greater Clark Cnty. Sch. Bldg. Corp.*,
   659 F.2d 836 (7th Cir. 1981) ............................................... 61

*In re Henson*,
   869 F.3d 1052 (9th Cir. 2017) ............................................. 57

*Innospec Ltd.* v. *Ethyl Corp.*,
   No. 14-cv-158, 2014 WL 5460413 (E.D. Va. Oct. 27, 2014) ............... 43

*J.J. Ryan & Sons, Inc.* v. *Rhone Poulenc Textile, S.A.*,
   863 F.2d 315 (4th Cir. 1988) ............................................... 59

*JAE Props., Inc.* v. *AMTAX Holdings 2001-XX, LLC*,
   716 F. Supp. 3d 918 (S.D. Cal. 2024) ................................... 53

*Kramer* v. *Toyota Motor Corp.*,
   705 F.3d 1122 (9th Cir. 2013) ......................................... 45, 46

*Mill Alley Partners* v. *Wallace*,
   341 P.3d 462 (Ariz. Ct. App. 2014), *as amended on*
   *reconsideration* (Mar. 17, 2015) ......................................... 31

*Molecular Dynamics, Ltd.* v. *Spectrum Dynamics Med. Ltd.*,
   No. 24-2209-CV, ___ F.4th ___, 2025 WL 1813185 (2d Cir.
   July 2, 2025) ......................................................... 28, 29

*Morgan* v. *Sundance, Inc.*,
   596 U.S. 411 (2022) ................................................. 32, 38

# TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

*Mundi* v. *Union Sec. Life Ins. Co.*,
    555 F.3d 1042 (9th Cir. 2009)............................................................58

*Nat'l Am. Ins. Co.* v. *SCOR Reinsurance Co.*,
    362 F.3d 1288 (10th Cir. 2004)..................................................40, 49

*Neal* v. *Hardee's Food Sys., Inc.*,
    918 F.2d 34 (5th Cir. 1990).................................................................41

*New Hampshire* v. *Maine*,
    532 U.S. 742 (2001)................................................................34, 36

*Oracle Am., Inc.* v. *Myriad Grp. A.G.*,
    724 F.3d 1069 (9th Cir. 2013).........................................................43

*PC Onsite, LLC* v. *Massage En V, LLC*,
    No. 1 CA-CV 10-0879, 2011 WL 6810919 (Ariz. Ct. App.
    Dec. 27, 2011) .......................................................................13

*Portland Gen. Elec. Co.* v. *Liberty Mut. Ins. Co.*,
    862 F.3d 981 (9th Cir. 2017).........................................................42

*PowerAgent Inc.* v. *Electronic Data Systems Corp.*,
    358 F.3d 1187 (9th Cir. 2004).......................................................35

*Prima Paint Corp.* v. *Flood & Conklin Mfg. Co.*,
    388 U.S. 395 (1967).......................................................................55

*Prograph Int'l Inc.* v. *Barhydt*,
    928 F. Supp. 983 (N.D. Cal. 1996).....................................................59

*Progressive Cas. Ins. Co.* v. *C.A. Reaseguradora Nacional De
    Venezuela*,
    991 F.2d 42 (2d Cir. 1993) ..............................................................40

*Schoenduve Corp.* v. *Lucent Techs., Inc.*,
    442 F.3d 727 (9th Cir. 2006)...........................................................55

## TABLE OF AUTHORITIES
### (CONTINUED)

**Page(s)**

*Simula, Inc.* v. *Autoliv, Inc.*,
  175 F.3d 716 (9th Cir. 1999) ....................................................... 48, 55

*Sinclair* v. *Servicemaster Co.*,
  No. 07-cv-611, 2007 WL 3407138 (E.D. Cal. Nov. 14, 2007) ............. 49

*Standard Bent Glass Corp.* v. *Glassrobots Oy*,
  333 F.3d 440 (3d Cir. 2003) ................................................................ 40

*Star Phx. Mining Co.* v. *W. One Bank*,
  147 F.3d 1145 (9th Cir. 1998) ............................................................ 31

*Sun Valley Ranch 308 Ltd. P'ship ex rel. Englewood Props.,
  Inc.* v. *Robson*,
  294 P.3d 125 (Ariz. Ct. App. 2012) .................................... 57, 58, 59, 60

*Tenet Healthsystem TGH, Inc.* v. *Silver*,
  52 P.3d 786 (Ariz. Ct. App. 2002) ...................................................... 30

*United States* v. *Garcia-Lopez*,
  309 F.3d 1121 (9th Cir. 2002) ............................................................ 33

*Worldwide Film Prods., LLC* v. *JPMorgan Chase Bank,
  N.A.*, No. 19-cv-10337, 2020 WL 2730926 (C.D. Cal. Mar.
  13, 2020) ............................................................................................. 46

*Wulfe* v. *Valero Ref. Co.-Cal.*,
  641 F. App'x 758 (9th Cir. 2016) ........................................................ 35

*Young* v. *ByteDance Inc.*,
  700 F. Supp. 3d 808 (N.D. Cal. 2023) ................................................ 46

**STATUTES**

9 U.S.C. § 201 ........................................................................................ 6

9 U.S.C. § 203 ................................................................................... 4, 6

# TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

9 U.S.C. § 206 ................................................................. 6

9 U.S.C. § 207 ............................................................... 22

9 U.S.C. § 208 ................................................................. 6

28 U.S.C. § 1291 .............................................................. 4

28 U.S.C. § 1331 .............................................................. 4

28 U.S.C. § 1332(a)(2)....................................................... 4

28 U.S.C. § 2107(a).......................................................... 4

**RULES**

Fed. R. App. P. 4(a)(1) ..................................................... 4

Fed. R. App. P. 12(b)(1) .................................................. 13

LCIA Arbitration Rules 2020, art. 23.1................................. 42

LCIA Arbitration Rules 2020, art. 25.2................................. 19

Restatement (Third) U.S. Law of Int'l Comm. Arb. § 4.2
    cmt. a. (2024)........................................................ 28

United Nations Commission on International Trade Law
    Arbitration Rules, art. 21, G.A. Res. 31/98, U.N. Doc.
    A/RES/31/98 (Dec. 15, 1976)................................... 42

**OTHER AUTHORITIES**

English Arbitration Act 1996, ch. 23, pt. 1, § 38(3) ................ 19

United Nations Convention on the Recognition and
    Enforcement of Foreign Arbitral Awards, June 10, 1958,
    21 U.S.T. 2517, T.I.A.S. No. 6997 ............................ 5, 6, 39

-ix-

## INTRODUCTION

The events giving rise to this suit began when predecessors of Epicenter Loss Recovery, LLC, the Plaintiff-Appellant, obtained financing from Ganymede Investments Limited. Ganymede is a United Kingdom based subsidiary of Burford Capital Limited, which is a UK-based finance company publicly listed on the London Stock Exchange. The financing documents provided that any disputes between the parties would be resolved through arbitration in London, conducted by the London Court of International Arbitration ("LCIA") and overseen by the English courts.

An arbitration duly occurred in London, with the proceedings stretching over three years of discovery, briefing, and a 12-day evidentiary hearing. Epicenter *conceded* the jurisdiction of the arbitral tribunal over all claims and parties. It then lost on every claim—unanimously, with its own appointed arbitrator ruling against it—in a 233-page thoroughly reasoned arbitral award. A later award ordered an anti-suit injunction against Epicenter and the payment of respondents' costs.

The parties expressly agreed that their arbitration proceedings would be governed by the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"). The Convention provides that Epicenter can challenge that arbitral award *only* in the courts of England. Yet Epicenter attempts to end-run the Convention with this lawsuit. The district court properly rejected Epicenter's

-1-

ploy and dismissed the complaint. The arguments Epicenter now raises on appeal are meritless for multiple independent reasons.

*First*, under the terms of the Convention (as incorporated in the United States by the Federal Arbitration Act ("FAA")), U.S. courts lack authority in this suit to vacate the London tribunal's arbitration award or the personal guaranty that Epicenter's principal provided during the arbitration process. Epicenter was required to take its objections to the award award—including its belated (and non-sensical) argument that the LCIA was biased—to the English courts. The Convention forbids Epicenter's attempt to use this lawsuit to attack the arbitration award— whether directly or collaterally.

*Second*, Epicenter has waived, and should be estopped from asserting, every argument it presses on appeal. Epicenter expressly conceded before the arbitral tribunal that the tribunal had jurisdiction over *all parties* and *all claims*. The tribunal accepted that concession and held a 12-day hearing. Epicenter cannot take a contrary position now, long after the parties and the tribunal incurred substantial expense in reliance on Epicenter's concession.

*Third*, even setting aside Epicenter's waiver and estoppel, its objections to arbitrability are not properly before this Court. The arbitration provisions in the parties' agreements are binding on Epicenter. And those arbitration agreements delegated all questions of arbitrability to the arbitral tribunal by incorporating the LCIA rules. Courts routinely

-2-

hold that the incorporation of such rules is clear and unmistakable evidence of delegation; Epicenter cites no case to the contrary. The arbitration tribunal's decision in favor of arbitrability is therefore conclusive.

*Finally*, even if questions of arbitrability were before this Court, Epicenter's claims fall clearly within the scope of the arbitration provisions. It is plain from the face of the operative complaint that Epicenter's claims arise out of, or are connected to, the parties' integrated agreements executed simultaneously on April 22, 2013. Those agreements required arbitration. It is inconsequential that Burford was not a signatory to those agreements; after all, Epicenter's own theory was that Burford and Ganymede are so closely related as to be interchangeable.

\*

The events relevant to Epicenter's claims are now a decade old. An experienced arbitral tribunal, which included a former Arizona state court judge selected by Epicenter, unanimously rejected those claims in a comprehensive pair of decisions. Epicenter has no legitimate basis for seeking to relitigate a dispute that has already been adjudicated at great expense. Enough is enough. This Court should affirm the district court's decision and put a final end to this suit, which Epicenter was always obligated to arbitrate before a tribunal convened by the LCIA.

## JURISDICTIONAL STATEMENT

The district court properly exercised jurisdiction under 28 U.S.C. § 1331 because this action is governed by the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards and thus "arise[s] under the laws and treaties of the United States." 9 U.S.C. § 203. The district court also properly exercised diversity jurisdiction under 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between an Arizona citizen (Epicenter) and citizens of a foreign state (Ganymede and Burford, both incorporated in Guernsey, a UK Crown Dependency). *See* 3-ER-166, 3-ER-168–172.

On January 9, 2024, the district court entered final judgment dismissing all claims with prejudice. Epicenter timely noticed an appeal on February 7, 2024, within the 30 days permitted by Federal Rule of Appellate Procedure 4(a)(1) and 28 U.S.C. § 2107(a). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Does the Convention preclude Epicenter from challenging the foreign arbitral award and personal guaranty in a U.S. court?

2.    Did Epicenter waive, or should it be estopped from asserting, the arguments it presses on appeal because it intentionally relinquished them during the arbitration proceeding?

-4-

3.     Is Epicenter bound by valid arbitration agreements, including the parties' agreement to delegate all questions of arbitrability to the arbitral tribunal?

4.     Do Epicenter's claims in this action fall within the scope of the arbitration agreements?

## ADDENDUM

The text of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards appears in the accompanying Addendum.

## LEGAL BACKGROUND ON THE CONVENTION

The United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997 (the "Convention"), is a multilateral treaty governing international arbitration.

Article II of the Convention addresses agreements to arbitrate. *Id.*; *see also GE Energy Power Conversion France SAS, Corp.* v. *Outokumpu Stainless USA, LLC*, 590 U.S. 432, 438–439 (2020). It requires signatory states to recognize written arbitration agreements, and provides that the courts of a signatory state, "when seized of an action in a matter in respect of which the parties have made an [arbitration] agreement," must "refer the parties to arbitration, unless it finds that the said agreement

is null and void, inoperative or incapable of being performed." 21 U.S.T. at 2519.

Article V focuses on the recognition and enforcement of arbitral awards. *Id.* at 2520. "[T]he country in which an arbitral award is rendered is said to have primary jurisdiction over the arbitration award." *Esso Expl. & Prod. Nigeria Ltd.* v. *Nigerian Nat'l Petroleum Corp.*, 40 F.4th 56, 62 (2d Cir. 2022) (cleaned up). "The state with primary jurisdiction is free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief." *Id.* (cleaned up); *see* 21 U.S.T. at 2519 (Convention art. V(1)(e)). "All other signatory states are 'secondary jurisdictions,' and these states may decide only whether to enforce the arbitral award." *Esso Exploration*, 40 F.4th at 62 (citation omitted). The grounds for refusing enforcement are very limited and are listed in Article V. *See* 21 U.S.T. at 2520.

As a signatory state, the United States has implemented the Convention under Chapter 2 of the FAA. *See* 9 U.S.C. § 201. As relevant here, Chapter 2 grants federal courts jurisdiction over actions governed by the Convention, § 203; empowers courts to compel arbitration, § 206; and states that "Chapter 1"—which sets forth general arbitration principles—"applies to actions and proceedings brought under this chapter to the extent that [Chapter 1] is not in conflict with this chapter or the Convention," § 208. Domestic law thus fills any "gaps in the Convention." *Outokumpu*, 590 U.S. at 440.

STATEMENT OF THE CASE

A.    Factual Background

Most of Epicenter's factual allegations in its brief were adjudicated and rejected by the arbitration tribunal, and the Court should disregard them. Epicenter is precluded by the Convention from attempting to relitigate those allegations before this Court. *See Gulf Petro Trading Co.* v. *Nigerian Nat'l Petroleum Corp.*, 512 F.3d 742, 746–750 (5th Cir. 2008).

In 2009, Epicenter's predecessors-in-interest—Epicenter Partners LLC and Gray Meyer Fannin LLC (collectively, the "Debtors")—were involved in real estate litigation in Arizona and needed additional financing to continue the litigation. 1-ER-10. They secured that funding by entering a litigation-financing agreement—known as a Forward Purchase Agreement ("FPA")—with UK-based Ganymede. 1-ER-10. Ganymede is a subsidiary of Burford Capital; Ganymede was formed only days before execution of the original FPAs as a special purpose vehicle to enter into the financing transaction for tax reasons, but it has no employees or other business and Burford manages its affairs. 3-ER-175–178.

The original FPA, like the later agreements supplementing or amending it, contained an arbitration provision requiring that any disputes arising out of that agreement be resolved by arbitration seated in London, England and conducted under the rules of the LCIA ("LCIA Rules"). 3-ER-207. The arbitration provision further specified that "[a]ny attempt by [the Debtors] to seek relief or remedies in any other forum

-7-

[would] constitute a breach of [the FPA] and entitle [Ganymede] to damages, equitable relief and full indemnification against all costs and expenses incurred in connection therewith." *Id.*

The FPA funding enabled the Debtors to continue their real estate action, which they won in 2010. 1-ER-11. The judgment in their favor was for more than $110 million. *Id.* The Debtors later negotiated a settlement of that litigation in which they received a real estate interest (the "Leasehold Interest") but no cash. *Id.*

As the Debtors' senior secured creditor, Ganymede could have insisted on the sale of the Leasehold Interest to generate cash to pay Ganymede's entitlement under the then-existing FPA. Defendants-Appellees' Supplemental Excerpts of Record ("SER") 53–59. Instead, however, the Debtors requested that Ganymede amend the FPA and convert Ganymede's entitlement to a promissory note, secured by the Leasehold Interest, to allow the Debtors time to develop the real estate or secure alternative financing. *Id.* Ganymede agreed to that request.

To accomplish that change, the Debtors and Ganymede entered into a group of contemporaneous, integrated agreements on April 22, 2013 (the "April 2013 Agreements"). As relevant here, those agreements included:

1.      **The 2013 FPA.** The Debtors and Ganymede executed a "Second Supplemental Agreement and Amendment Relating to Restated and Amended Forward Purchase Agreement" (the "2013 FPA"). *See* 3-ER-

292–304. The 2013 FPA (a) incorporated all terms from prior FPAs; (b) confirmed that the total amount the Debtors owed to Ganymede was $50,713,000; and (c) detailed the parties' agreement that the debt to Ganymede was to be evidenced and secured by, *inter alia*, a promissory note, a deed of trust, and an "Intercreditor Agreement"—the three documents described further below. *See* 3-ER-292–293, 3-ER-298–300. The 2013 FPA also specified that it was made "subject to the terms and conditions of the Intercreditor Agreement," with the terms of the Intercreditor Agreement prevailing in the event of a conflict. 3-ER-298.

The 2013 FPA included an arbitration provision substantively identical to that in the original FPA providing that "[a]ny dispute, controversy or claim arising out of or in connection with this Agreement shall (to the exclusion of any other forum) be referred to and finally resolved by arbitration under the Arbitration Rules of The London Court of International Arbitration." 3-ER-301. The parties agreed that their "agreement to arbitrate, and any resulting award, [fell] under the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, and section 202, and Chapter 2, of the Federal Arbitration Act." *Id.* The parties further agreed that the "seat, or legal place, of arbitration [would] be London, England," and that no party would argue that Ganymede was subject to personal jurisdiction in the United States. 3-ER-301–302.

**2.      The Intercreditor Agreement.** In addition to the sum the Debtors owed Ganymede, they also owed fees to their counsel in the real

estate litigation: Simpson Thacher & Bartlett LLP. 3-ER-177–179. In the "Subordination and Intercreditor Agreement" ("Intercreditor Agreement"), the Debtors, Ganymede, and Simpson Thacher agreed that the debt owed to Simpson Thatcher was subordinate to the debt owed to Ganymede. 3-ER-313–334.

Like the 2013 FPA, the Intercreditor Agreement included an arbitration provision specifying that "[a]ny dispute, controversy, or claim arising out of or in connection with this Agreement shall (to the exclusion of any other forum) be referred to and finally resolved by arbitration under the Arbitration Rules of the London Court of International Arbitration." 3-ER-333. The parties agreed that their "agreement to arbitrate, and any resulting award," was subject to the Convention and Chapter 2 of the FAA, and that the seat of the arbitration would be London, England. *Id.* The parties further agreed to waive any claim to a jury trial and any argument that Ganymede was subject to personal jurisdiction in the United States. 3-ER-333–334.

**3.    The Note.** "[P]ursuant to" the 2013 FPA, the Debtors signed a promissory note ("Note") promising to pay to Ganymede the principal sum of $50,713,000 plus interest. 2-ER-136–137. The Note was "secured by" the deed of trust described below. 2-ER-137.

The Note specified—right at its very start, in bolded language— that it was subject to the Intercreditor Agreement, with the terms of the Intercreditor Agreement controlling in the event of a conflict:

-10-

This instrument and the rights and obligations evidenced hereby are subject to that certain Subordination and Intercreditor Agreement (the "Intercreditor Agreement") dated as of April 22, 2013 among SIMPSON THACHER & BARTLETT LLP; GRAY MEYER FANNIN L.L.C., an Arizona limited liability company, and EPICENTER PARTNERS L.L.C., an Arizona limited liability company, and GANYMEDE INVESTMENTS LIMITED, a company organized under the laws of Guernsey. Each holder of this instrument, by its acceptance hereof, irrevocably agrees to be bound by the provisions of the Intercreditor Agreement. In the event of any conflict between this instrument and the Intercreditor Agreement, the Intercreditor Agreement shall control.

### PROMISSORY NOTE

$50,713,000.00

Phoenix, Arizona

April 22, 2013

2-ER-136.

A separate provision of the Note concerned remedies related to potential efforts by the Investors to collect on the Note: The Debtors agreed to "pay all costs and expenses, including reasonable attorneys' fees and court costs, incurred in the collection or enforcement of all or any part of th[e] Note." 2-ER-137. "In the event of any court proceedings, court costs and attorneys' fees [would] be set by the court and not by jury and [would] be included in any judgment obtained by [Ganymede]." *Id.*

**4. The Deed of Trust.** The Note was secured by a "Deed of Trust" by which the Debtors assigned in trust, for the benefit of Ganymede, their rights to the Leasehold Interest for the purpose of securing the sum due to Ganymede under the 2013 FPA and the Note. *See* Defendants-Appellees' Motion to Supplement the Record (July 7, 2025), ECF

-11-

No. 41, Ex. 1[1]; *see also* 1-ER-11; 3-ER-181–183, 3-ER-295–296, 3-ER-298, 3-ER-313, 3-ER-316; SER-26. The Deed of Trust was made subject to the Intercreditor Agreement, with the terms of the Intercreditor Agreement controlling in the event of any conflict with the Deed of Trust. MTS-EX-1 at 22.

*

After the Debtors repeatedly failed to timely pay the Note, Ganymede sold the Note—as it was expressly authorized to do. *See* 2-ER-138 (Note provision saying it "shall inure to the benefit of [Ganymede], and any subsequent holders of this Note, and their successors and assigns"); 3-ER-274 (provision of earlier FPA allowing Ganymede to "assign its rights and obligations under this agreement without the express consent in writing of [the Debtors]"); 3-ER-300 (incorporating terms of earlier FPAs into the 2013 FPA).[2]

---

[1] Exhibits to the Motion to Supplement the Record will be cited as "MTS-EX-."

[2] While not relevant to this appeal, the factual allegations in Epicenter's Opening Brief (at 11, 18) are inaccurate and were rejected unanimously by the arbitration tribunal. The Note was marketed in 2015 at the then-current discount payment amount of $30,560,454—the amount for which it could have been repaid in full at the relevant date. SER-118. There was no obligation to notify the Debtors before marketing the Note. 3-ER-274. And there was no causal link between the marketing of the Note and the allegedly pending transactions that Epicenter now claims were disrupted. SER-175–180, 210–215.

-12-

### B.    Procedural History

#### 1.   Epicenter files suit, which the district court stays pending the parties' agreed-upon arbitration.

**a.**    The Debtors originally filed this suit in the Superior Court of Maricopa County, Arizona in 2018—in breach of their contractual promise to arbitrate any disputes in connection with the April 2013 agreements. 1-ER-11. The Debtors then assigned their claims to Epicenter. 1-ER-9 n.1. The parties agree that Epicenter, as the assignee of the Debtors, is bound by the agreements the Debtors signed. *See* Opening Brief ("OB") 27.[3]

The operative Second Amended Complaint pleaded three claims. The first sought a declaration that Ganymede was "a mere alter ego of Burford." 3-ER-186. The second alleged that Ganymede and Burford breached the covenant of good faith and fair dealing implied into the Note. 3-ER-187–188. The third alleged that Burford had tortiously interfered with the Debtors' "business expectancy" by marketing the Note. 3-ER-188–189.

**b.**    Ganymede and Burford (collectively, the "Investors") timely removed the case to federal court. 3-ER-166–174. They then filed a Rule

---

[3]  *See also, e.g.*, *Comedy Club, Inc.* v. *Improv W. Assocs.*, 553 F.3d 1277, 1287 (9th Cir. 2009) (arbitration clauses bind assignee); *PC Onsite, LLC* v. *Massage En V, LLC*, No. 1 CA-CV 10-0879, 2011 WL 6810919, at *2 (Ariz. Ct. App. Dec. 27, 2011) (mem.) (same).

12(b)(1) motion to compel arbitration under the FAA and to dismiss or stay the litigation. 2-ER-140–164.

In January 2019, the district court granted the Investors' motion to compel arbitration, explaining that the arbitration provisions in the Intercreditor Agreement expressly applied to the simultaneously executed Note. *See* 1-ER-9–21. The court observed that "the Note was executed simultaneously with the 2013 FPA and the Intercreditor Agreement"; that "the Note specifically provides that it is 'subject to' the Intercreditor Agreement"; and that the parties had agreed that the terms of the Intercreditor Agreement would control "'[i]n the event of any conflict'" with the Note. 1-ER-14 (quoting Note at 2-ER-135).

Having determined "that the Note incorporates the Intercreditor Agreement, which includes its arbitration provision," the court next considered "*who*—the arbitrator or the Court—should decide the gateway question" of whether Epicenter's "claims against Ganymede fall within the scope of the Intercreditor Agreement's arbitration provision." 1-ER-14. The court determined that the question must "be left to the arbitrator because the Intercreditor Agreement's arbitration provision specifically provides that the LCIA rules govern arbitrations[,] and the LCIA rules provide that the arbitrator decides issues of arbitrability." 1-ER-16. "Thus, the incorporation of LCIA rules in the Intercreditor Agreement's arbitration provision is a clear and unmistakable agreement to delegate

-14-

the adjudication of the gateway issue of arbitrability to the arbitrator."
1-ER-16–17.

The district court also determined that Burford, though a non-signatory, is entitled to enforce the arbitration provisions based on the closeness of "the relationship between Burford and Ganymede." 1-ER-18. Indeed, Epicenter itself had claimed that Ganymede should be considered a mere alter ego of Burford. *Id.* Moreover, Epicenter's claims against Burford were "founded in and intertwined with Ganymede's obligations and rights under the Note." *Id.* Epicenter's claim for breach of the covenant of good faith and fair dealing, for example, was "alleged against both Ganymede and Burford, and entirely depend[ed] on Burford being found to be a party to the Note." 1-ER-19. Similarly, Epicenter's claim for tortious interference against Burford "stem[med] from how Ganymede, not Burford, marketed and then sold the Note." *Id.* "Thus, [Epicenter's] claims necessarily rel[ied] on the existence of the Note and require[d] an examination of Ganymede's rights and obligations under the Note." *Id.*

Finally, the district court determined that a stay—rather than dismissal of the case—was appropriate because "the arbitrator [would] decide which of [Epicenter's] claims [were] subject to arbitration and, if the arbitrator decide[d] that not all of [Epicenter's] claims [were] subject to arbitration, then this litigation [could] proceed … on those non-arbitrable claims." 1-ER-20. The court therefore stayed the action and ordered the parties to file a joint status report as to the arbitrability of

-15-

Epicenter's claims after the arbitrator "render[ed] a decision on its juris-diction over [Epicenter's] claims." *Id.*

**c.** After Epicenter failed to commence arbitration for more than a year, the district court dismissed Epicenter's suit without prejudice. 2-ER-99–100. This Court reversed, explaining that "less drastic alternatives" were available to address Epicenter's delay. 2-ER-97. The Court concluded that dismissal was too harsh a sanction because, due to the applicable statute of limitations, Epicenter could "lose the right to challenge Burford in court should the arbitrator decide that it [did] not have jurisdiction or that any of the claims [were] not arbitrable." *Id.*

On remand, the district court again stayed the matter pending arbitration. 2-ER-92.

**2. Epicenter concedes the arbitral tribunal's jurisdiction and the arbitrability of its claims.**

Epicenter finally initiated arbitration via the LCIA in early 2020. SER-24. The LCIA—per the arbitration provisions in the 2013 FPA and Intercreditor Agreement (3-ER-301, 3-ER-333)—convened an arbitral tribunal ("Tribunal") with three members: a former Arizona state court judge selected by Epicenter, a former English High Court judge selected by the Investors, and a professional international arbitrator selected by the other arbitrators and approved by Epicenter and the Investors. SER-30.

In proceedings before the Tribunal, Epicenter *conceded* that the Debtors had agreed to arbitrate their claims, and that the Tribunal had jurisdiction to decide them. Epicenter initially suggested, in its request for arbitration, that it would challenge the Tribunal's jurisdiction over the claims against Burford (though not Ganymede). *See* Defendants-Appellees' Motion Requesting Judicial Notice (July 7, 2025), ECF No. 42, Ex. A at 2.[4] But Epicenter later expressly "abandoned" that position and "accept[ed] [that] the Tribunal ha[d] jurisdiction to entertain the application by/against all parties." RJN-EX-C at 4.

Accordingly, by the time the parties submitted their "Agreed List of Issues and Common Ground" on February 3, 2022, it was accepted as "common ground" between the parties that the arbitration provision of the Intercreditor Agreement applied; that Epicenter's claims against both Investors were subject to arbitration; and that the Tribunal had jurisdiction to decide those claims:

---

[4] Exhibits to the Motion Requesting Judicial Notice will be cited as "RJN-EX-."

**Jurisdiction**

**Common Ground**

1.  The Promissory Note, dated 22 April 2013 (the "**Note**"), incorporated the LCIA arbitration agreement (the "**Arbitration Agreement**") contained in clause 17 of the Subordination and Intercreditor Agreement, also dated 22 April 2013 (the "**ICA**").[1]

2.  The Tribunal has jurisdiction to determine the claims brought by the Claimant ("**ELR**") against the First Respondent ("**Ganymede**") and the Second Respondent ("**BCL**") in this arbitration, pursuant to the Arbitration Agreement.[2]

RJN-EX-D at 1.[5]

Consistent with Epicenter's stipulation to the Tribunal's jurisdiction over Burford, Epicenter repeatedly emphasized the close relationship between Ganymede and Burford, as well as Burford's ties to the relevant agreements. *See, e.g.*, RJN-EX-D at 2 n.6 (stating Epicenter's position "that Ganymede entered into the FPAs as agent for [Burford]"); RJN-EX-B at 13 (describing Ganymede as "a shell company with no real existence separate from Burford"); *id.* at 14 ("Burford has always regarded itself, and held itself out, as a party to the relevant agreements with Epicenter, including the Note.").

---

[5] Epicenter's pre-hearing brief to the arbitrators similarly stated that "[t]he Note was governed by Arizona law and incorporated the Arbitration Agreement contained in the ICA." RJN-EX-E at 15.

### 3. The parties invest substantial resources in a comprehensive arbitration proceeding.

The London Tribunal carefully considered Epicenter's claims and the arguments on both sides. As an initial step, because Epicenter was a special-purpose vehicle created for the sole purpose of pursuing the arbitration claims, the Tribunal ordered Epicenter's principal, Bruce Gray, to provide a personal guaranty in the amount of £800,000 to secure any order for costs. SER-32–34. Security for costs is a common feature in English-seated arbitration and English litigation, and it is expressly contemplated by both the English Arbitration Act and LCIA Rules. *See* English Arbitration Act 1996, ch. 23, pt. 1, § 38(3), http://bit.ly/3GqoW1M ("The tribunal may order a claimant to provide security for the costs of the arbitration."); LCIA, *LCIA Arbitration Rules 2020*, art. 25.2, http://bit.ly/3HWDk2u ("The Arbitral Tribunal shall have the power … to order any claiming, counterclaiming or cross-claiming party to provide or procure security for Legal Costs and Arbitration Costs … .").

The Tribunal then analyzed the parties' submissions, which included hundreds of pages of briefing and thousands of pages of evidence, and held a 12-day hearing in early 2023. SER-20. The Tribunal heard testimony from four fact and six expert witnesses. SER-22–23. Epicenter's principal, Mr. Gray, testified for nearly two days. *Id.*

-19-

In April 2023, the Tribunal issued a 233-page Final Partial Award unanimously rejecting Epicenter's claims against the Investors. The Tribunal first observed that it was "common ground among the Parties that the Note incorporated by reference the [Intercreditor Agreement's arbitration provision] and that the Tribunal [had] jurisdiction to decide the claims." SER-28. The Tribunal then determined, among other things, that:

> ➢ It had jurisdiction to resolve the parties' claims.
>
> ➢ Epicenter's implied-covenant and tortious-interference claims against the Investors were meritless.
>
> ➢ Because Epicenter had no valid claim for relief, it was unnecessary to decide the alter-ego claim.
>
> ➢ The Debtors breached the arbitration agreement by bringing suit in Arizona; Epicenter was liable for that breach; and Ganymede was entitled to equitable compensation for the costs of defending that suit.
>
> ➢ The Investors were entitled to an anti-suit injunction against Epicenter.

SER-234–235.

In December 2023, the Tribunal issued a 48-page Final Award. The Final Award added details to the anti-suit injunction (*e.g.*, barring Epicenter from commencing or continuing any action against the Investors

-20-

regarding the Note); set the amount of equitable compensation Epicenter owed Ganymede; and ordered Epicenter to pay costs. 2-ER-63–65.

Notably, Epicenter did not raise any concerns about any purported conflicts of interest at the LCIA until *after* the Tribunal issued its Final Partial Award, at which point the argument had been waived. *See* SER-3–236; RJN-EX-F; RJN-EX-G. Epicenter never raised any such concerns with the Tribunal or the supervising English court. Nothing in the record supports Epicenter's latest allegations (OB 4, 16, 46) about Burford having a relationship with the LCIA—and Burford flatly denies those allegations. *See infra* note 6.

### 4. The district court dismisses Epicenter's suit, and Epicenter appeals.

Epicenter did not seek review of the arbitration award from the English courts that have primary jurisdiction over the arbitration and the award. And the Investors have not moved to confirm or enforce the arbitration award.

Instead, following the arbitration, the Investors moved for dismissal of the stayed district court action. 1-ER-2. After considering the Final Partial Award and the Final Award, the district court dismissed Epicenter's claims with prejudice. 1-ER-8. The court explained that "neither the LCIA Rules nor the FAA provide[d] [it] with the necessary jurisdiction over disputes arising out of the international arbitration proceedings." 1-ER-6. And under the Convention, the country in which an arbitral

award was rendered (England) has primary jurisdiction over the award, which confers the power to vacate or modify it; all other signatory states (including the United States) are secondary jurisdictions that may only enforce (not vacate or modify) the award. 1-ER-7. This is "consistent with the text of the FAA," which "provides district courts with the authority to *enforce* international arbitrations arising under the Convention," but "is silent as to whether district courts have the authority to modify or otherwise vacate a foreign arbitral award." 1-ER-7–8 (citing 9 U.S.C. §§ 206–207). The district court thus concluded that it did not have jurisdiction to consider any disputes Epicenter might wish to raise in connection with the arbitration.

## SUMMARY OF ARGUMENT

Epicenter's predecessors-in-interest signed a set of interrelated agreements specifying that any disputes arising out of those agreements would be resolved through arbitration in London. The district court correctly enforced those agreements and compelled arbitration, which Epicenter lost unanimously. Epicenter has no legitimate basis for seeking to undo the foreign arbitral award in the courts of this country.

**A.** The district court properly rejected Epicenter's audacious request to declare the foreign arbitral award and guaranty null and void. Under the Convention, only courts in the primary jurisdiction (England) can vacate this arbitral award, and Epicenter has made no attempt to

-22-

seek review from those courts. Courts in secondary jurisdictions (including the United States) may decide only whether to *enforce* the award, but there is no enforcement proceeding pending. Under the Convention, the Tribunal's award stands regardless of the outcome of this appeal.

Furthermore, the validity of Mr. Gray's personal guaranty does not depend on either this appeal or the Tribunal's award. The personal guaranty was never at issue in the litigation before the district court; Mr. Gray was not a party to that litigation or the arbitration; and Mr. Gray is not an appellant in this appeal. Moreover, Arizona law provides that a personal guaranty is a separate contractual obligation that is enforceable even when a principal's liability on the debt is disputed or extinguished.

**B.**     Epicenter has waived, and should be estopped from asserting, the arguments it presses in its brief. Before the London Tribunal, Epicenter expressly conceded that the Note incorporated the arbitration provision of the Intercreditor Agreement and that the Tribunal had jurisdiction to adjudicate Epicenter's claims against both Ganymede and Burford. Epicenter has thus intentionally relinquished the arguments it presents here. Epicenter should also be estopped from asserting arguments contrary to those it advanced in arbitration because (i) the arguments are clearly inconsistent; (ii) Epicenter succeeded in persuading the Tribunal to adjudicate its claims; and (iii) the Investors would be prejudiced if Epicenter were permitted to relitigate those issues now, when they could

have saved significant sums in arbitration if Epicenter had successfully contested arbitrability before the Tribunal.

**C.**    Even setting aside the Convention, waiver, and estoppel, Epicenter's attacks on arbitrability are not properly before this Court because Epicenter is bound by arbitration agreements that delegated all questions of arbitrability to the London Tribunal. The agreements expressly incorporated the arbitration rules of the LCIA, which provide that the arbitral tribunal has the power to rule on its own jurisdiction and authority, including challenges to the validity and scope of the arbitration agreements. This Court and others have uniformly held that the incorporation of rules with such language is clear and unmistakable evidence that the parties agreed to delegate questions of arbitrability to the arbitrators. Epicenter cites no case to the contrary.

Epicenter attempts to dodge its commitments in the Intercreditor Agreement and 2013 FPA—both of which delegate all questions of arbitrability to the arbitral tribunal—by contending that it is suing under only the Note. But the Note expressly states that it is subject to the Intercreditor Agreement and that the terms of the Intercreditor Agreement control. And context shows that the Note was executed as part of an integrated set of agreements that all refer to each other and work together substantively. Accordingly, even if a conflict did exist between the Note and the Intercreditor Agreement and 2013 FPA, the latter doc-

uments would prevail—and they unmistakably delegate all questions of arbitrability to the arbitral Tribunal.

In any event, there is no conflict between the Note, on the one hand, and the Intercreditor Agreement and 2013 FPA, on the other, as the Note does not have a forum-selection clause for substantive disputes. Epicenter tries to create a conflict by transmogrifying standard contract language in the Note about the Investors' entitlement to attorneys' fees and court costs into a provision referring disputes over the Note to courts. That argument is a red herring: courts are obviously sometimes needed to enforce arbitration awards against assets in their jurisdictions, and the provision for court *costs* is a common feature of financing arrangements. All this provision says is that *the Debtors* would have to pay collection/enforcement costs in the event they defaulted on their contractual obligations. It says nothing about how the nature or validity of those contractual obligations are to be determined—such disputes must be arbitrated, per the Intercreditor Agreement and 2013 FPA.

**D.** Even if this Court were to reach arbitrability notwithstanding the delegation clause, Epicenter's claims are plainly within the scope of the arbitration provisions. The operative complaint alleges that the Investors provided litigation financing to the Debtors pursuant to the original FPA, which was restated and amended several times; that the Debtors executed the Note in the amount of the debt owed under the 2013 FPA; and that the Investors later marketed the Note, supposedly wrong-

-25-

fully. The 2013 FPA is thus central to Epicenter's claims, and that agreement mandates arbitration of all disputes "arising out of or in connection with" it. Moreover, the Note is expressly "subject to" the Intercreditor Agreement, which mandates arbitration of all disputes "arising out of or in connection with" it as well. And even if the Note did not incorporate the Intercreditor Agreement's arbitration provision (as it does), Epicenter's claims would still fall within the broad scope of the arbitration provisions in both the Intercreditor Agreement and the 2013 FPA. That's because the Note was executed to effectuate those agreements, and it would be impossible to determine liability under the Note without determining the parties' rights and obligations under those agreements.

The district court thus correctly determined that Epicenter was obligated to arbitrate its claims against the Investors, including against Burford. While Burford was not a signatory to the April 2013 agreements, it is entitled to enforce the arbitration clauses in those agreements under long-standing principles of estoppel because (i) the relationship between Burford and Ganymede is so close that the arbitration provisions would be effectively nullified if Burford were not permitted to enforce them along with Ganymede; and (ii) each of Epicenter's claims against Burford arises out of the agreements containing the arbitration provisions.

## STANDARD OF REVIEW

This Court reviews de novo a district court's decision to grant or deny a motion to compel arbitration. *Holley-Gallegly* v. *TA Operating, LLC*, 74 F.4th 997, 1000 (9th Cir. 2023).

## ARGUMENT

The district court correctly dismissed this action, and that judgment should be affirmed. In the first place, the Convention (incorporated by the FAA) forbids Epicenter's attempt to have this Court override the London Tribunal's arbitration decision and Mr. Gray's personal guaranty. Moreover, Epicenter has repeatedly and expressly waived its ability to present this appeal, and it has previously conceded away the objections to arbitration that it now attempts to bring to this Court. In any event, none of those objections has merit. Epicenter's claims were properly resolved in arbitration pursuant to the parties' express agreement to arbitrate *all* disputes related to their contracts.

### A.   Only an English court could consider Epicenter's challenge to the arbitral tribunal's arbitration awards and requirement of a personal guaranty.

The district court correctly determined that no U.S. court (including this Court) has authority to consider Epicenter's extraordinary request

(OB 46) to declare the award and guaranty "null and void" based on the purported "bias and undisclosed conflicts" of the LCIA or the Tribunal.[6]

1.    Under the Convention, "only courts in the primary jurisdiction can vacate an arbitral award." *Corporacion AIC, SA* v. *Hidroelectrica Santa Rita S.A.*, 66 F.4th 876, 883 (11th Cir. 2023). Here, the seat of the arbitration was London, England, so Epicenter could challenge the award only in the courts of England. *See Molecular Dynamics, Ltd.* v. *Spectrum Dynamics Med. Ltd.*, No. 24-2209-CV, ___ F.4th ___, 2025 WL 1813185, at *9 (2d Cir. July 2, 2025) (the Convention allows "for vacatur proceedings in the primary jurisdiction initiated by the losing party"); *Hawaiian Host, Inc.* v. *Citadel Pac. Ltd.*, 637 F. Supp. 3d 1083, 1094 n.6 (D. Haw. 2022) (only an English tribunal would have the power to annul or vacate an award issued in London, England). But Epicenter never challenged the award in the English courts, and the time to do so has long passed.

"[A] United States court sitting in secondary jurisdiction" lacks authority "to vacate, set aside, or modify a foreign arbitral award." *Gulf Petro*, 512 F.3d at 747; *see also* Restatement (Third) U.S. Law of Int'l Comm. Arb. § 4.2 cmt. a. (2024) (same). "In a secondary jurisdiction, par-

---

[6] Epicenter's allegations of "conflicts" are not just unsupported, *see supra* p. 21; they are nonsensical. Burford was founded as a startup in 2009, the same year that Epicenter's predecessors-in-interest first entered an agreement providing for LCIA arbitration. It belies belief that Burford had some undisclosed pecuniary relationship with the LCIA at its inception that it kept secret from Epicenter's predecessors so that it could capitalize in an arbitration filed *eleven years later*.

-28-

ties can only contest whether that jurisdiction should enforce the arbitral award, meaning that the party that prevailed in arbitration must first initiate a recognition-and-enforcement action before the losing party may contest the award." *Molecular Dynamics*, 2025 WL 1813185, at *8 (cleaned up). The Convention thus "envisions a mostly limited, reactive role for the losing party in an arbitration." *Id.* That limitation also precludes any attempt by a losing party like Epicenter to "collateral[ly] attack" an arbitration award. *Gulf Petro*, 512 F.3d at 749.[7]

As Epicenter acknowledges (OB 46), "neither Burford nor Ganymede has yet sought to enforce or domesticate the LCIA award in the United States." Accordingly, there is no present controversy regarding enforcement that could justify this Court's review of the award.

---

[7] The district court held that it lacked "subject matter jurisdiction" to consider Epicenter's arguments contesting the arbitral award in this suit. 1-ER-7–8. That holding is consistent with the Fifth Circuit's opinion in *Gulf Petro*, 512 F.3d at 750 ("Because the Convention bars the litigation of claims of the type asserted by Gulf Petro in all but the courts of the primary jurisdiction, dismissal for lack of subject matter jurisdiction was appropriate in this case."), and the Second Circuit's opinion in *Molecular Dynamics*, 2025 WL 1813185, at *12 (holding that a petition to vacate a foreign arbitral award does not "'fall under' the Convention" and therefore that "9 U.S.C. § 203 does not supply the necessary grant of subject-matter jurisdiction to the district court"). But it is not necessary for this Court to determine in this case whether Epicenter's complaint was properly dismissed for lack of subject matter jurisdiction or failure to state a claim for relief, because the Investors timely asserted the Convention as a complete bar to Epicenter's claims in this lawsuit.

-29-

Epicenter nonetheless implies (OB 46–47) that it may ask this Court to reverse the district court's interlocutory order compelling arbitration, and thereby somehow invalidate the Tribunal's award. But Epicenter cites no authority for that proposition, and the Investors have found none. The cases Epicenter cites (*id.*) involve the vacatur or confirmation of *domestic* arbitral awards—not foreign awards issued pursuant to the Convention, for which all challenges (whether direct or collateral) are channeled to the primary jurisdiction.

2.    The personal guaranty is yet another step removed, even beyond the award itself. As noted, Bruce Gray chose to execute the personal guaranty—an independent, enforceable contract governed by Arizona law—as security for the Investors' costs in the arbitration. *See supra* p. 19. The personal guaranty was never at issue in the litigation before the district court. Nor could it have been—it was executed years after the district court granted the motion to compel arbitration. Mr. Gray was not a party to that litigation or the arbitration, and he is not an appellant in this appeal.

Moreover, Mr. Gray's guaranty is not contingent on the outcome of this appeal, as Arizona law provides that a personal guaranty is a separate contractual obligation that is enforceable independent from the underlying obligation it supports. *See Tenet Healthsystem TGH, Inc.* v. *Silver*, 52 P.3d 786, 787–788, 790–791 (Ariz. Ct. App. 2002) (holding that a personal guaranty is an enforceable, independent obligation, not extin-

guished by actions challenging the underlying secured obligation); *Mill Alley Partners* v. *Wallace*, 341 P.3d 462, 465 (Ariz. Ct. App. 2014) (a "guaranty contract is independent of the underlying obligation" and must be considered as a separate contract from the principal obligation that is triggered upon the occurrence of the guaranteed event), *as amended on reconsideration* (Mar. 17, 2015); *Flori Corp.* v. *Fitzgerald*, 810 P.2d 599, 600–601 (Ariz. Ct. App. 1990) (allowing enforcement of guaranty separate from enforcement of the underlying debt). Guaranty agreements remain enforceable in Arizona even when the principal's liability on the debt is disputed or extinguished. *See Star Phx. Mining Co.* v. *W. One Bank*, 147 F.3d 1145, 1147–1148 (9th Cir. 1998) (holding that, though a debtor's liability on an underlying debt was extinguished under a bankruptcy plan, a personal guaranty remained enforceable against the debtor's owners for any remaining outstanding debt).

*

The Court should enforce the Convention and reject Epicenter's attempted end-run around the proper procedures for challenging the arbitral award and personal guaranty.

### B. Epicenter has waived, and should be estopped from asserting, the arguments it presses on appeal.

One of the most striking features of Epicenter's brief is what it fails to disclose to this Court: every argument it advances on appeal is diametrically opposed to the positions it took before the Tribunal. As noted

above, in the parties' statement of common ground in London, Epicenter agreed that the Note incorporated the arbitration provision of the Intercreditor Agreement and that the Tribunal had jurisdiction to determine Epicenter's claims against Ganymede and Burford. RJN-EX-D at 1. Epicenter thus conceded—directly contrary to what it now argues—that the Note includes an arbitration provision (incorporated from the Intercreditor Agreement); that the Tribunal was entitled to decide questions of arbitrability; and that Epicenter's claims against the Investors fell within the scope of the arbitration provision. Further, by acknowledging that the Note incorporated an arbitration provision subject to the Convention, Epicenter conceded that the Convention—which allows for challenges to arbitral awards only in the country with primary jurisdiction—applies.

Whether because of waiver or estoppel, Epicenter should not be permitted to argue the opposite points before this Court.

### 1. Epicenter waived its current arguments by intentionally relinquishing them.

Epicenter has waived most of the arguments presented in its Opening Brief. Waiver is simply "the intentional relinquishment or abandonment of a known right." *Morgan* v. *Sundance, Inc.*, 596 U.S. 411, 417 (2022) (cleaned up). To decide whether a waiver has occurred, courts "focus[] on the actions of the person who held the right." *Id.* "There is no concrete test" that courts apply; rather, they "consider the totality of the

parties' actions." *Hill* v. *Xerox Bus. Servs., LLC*, 59 F.4th 457, 471 (9th Cir. 2023) (citation omitted).

Epicenter initially resisted arbitration in the district court. But after the district court found that Epicenter had agreed to arbitration and that the parties had delegated all questions of arbitrability, Epicenter *affirmatively relinquished* its arguments contesting arbitrability in proceedings before the Tribunal. It did not participate in the arbitration under a reservation of rights. It instead expressly conceded, as common ground, that the arbitration provision of the Intercreditor Agreement applied and that the Tribunal had jurisdiction to determine all of its claims. With respect to claims against Burford as a non-signatory, Epicenter "abandoned" any contest to jurisdiction and "accept[ed] [that] the Tribunal ha[d] jurisdiction to entertain the application by/against all parties." RJN-EX-C at 4. That is classic waiver. *See, e.g.*, *United States* v. *Garcia-Lopez*, 309 F.3d 1121, 1123 (9th Cir. 2002) (counsel waived appeal-waiver argument by "specifically urg[ing] the Court to reach the merits of this appeal") (citation omitted).[8]

---

[8] Epicenter may argue on reply that it did not *fully* accept Burford's ability to enforce the Note, because the parties' statement of "Common Ground" included the following two sentences: "Pursuant to the holdings made in the Order of the Arizona District Court dated 14 January 2019, [Burford] is entitled to enforce the Arbitration Agreement regardless of whether or not it is a party to the Note (which is a disputed issue). It is common ground that this order gives rise to an issue estoppel in this arbitration." RJN-EX-D at 11. That objection, if raised, would not apply

-33-

Waiver is especially clear here because both the district court and this Court expected Epicenter to raise any arbitrability challenge in the arbitration. The district court found that questions of arbitrability were delegated to the arbitral tribunal. 1-ER-16–17. And this Court, in determining that the litigation should remain stayed pending arbitration, anticipated that the Tribunal would decide its own jurisdiction and whether "any of the claims [were] not arbitrable." 2-ER-97. But Epicenter never presented the Tribunal with any arguments regarding arbitrability or the scope of the arbitration provision—it instead expressly conceded those arguments.

### 2. Epicenter is estopped from asserting arguments contrary to those it advanced in arbitration.

Epicenter's arguments to this Court are also barred by the doctrine of judicial estoppel. *I.e.*, the principle that "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire* v. *Maine*, 532 U.S. 742, 749 (2001).

---

to Ganymede. Anyway, those two sentences are not remotely sufficient to preserve a challenge to Burford's ability to enforce the Note, especially given Epicenter's express "abandon[ment]" of that exact challenge notwithstanding the district court finding that the matter was for the arbitral tribunal to decide.

-34-

This Court has applied judicial estoppel to prevent litigants from advancing one argument before an arbitrator and a different argument before a court. In *PowerAgent Inc.* v. *Electronic Data Systems Corp.*, 358 F.3d 1187 (9th Cir. 2004), for example, the plaintiff "affirmatively submitted [an] issue to the arbitrators and urged that they had power to decide it." *Id.* at 1191. Because plaintiff had signaled its "intent to be bound by the arbitrator's decision on the issue of arbitrability," the Court held that it was "estopped from later changing its position and challenging the arbitrator's authority to determine the issue of arbitrability." *Id.* at 1192.

In other cases too, this Court has applied judicial estoppel to bar litigants from advancing a position in court that contradicts what they argued before an arbitrator. *See, e.g.*, *Wulfe* v. *Valero Ref. Co.-Cal.*, 641 F. App'x 758, 761 (9th Cir. 2016) ("The district court did not abuse its discretion when it found that Wulfe was judicially estopped from arguing that the arbitrator's award should be reviewed de novo."); *Carr* v. *Liberty Life Assur. Co.*, 390 F. App'x 694, 695 (9th Cir. 2010) ("The district court properly confirmed the arbitration award because, after consenting to and moving to compel binding arbitration, Carr was judicially estopped from objecting to the award on the ground that the arbitration was not binding on her under ERISA regulations.").

While "[c]ourts have observed that the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible

to any general formulation of principle," *New Hampshire*, 532 U.S. at 750 (cleaned up), all three factors that courts typically consider weigh in favor of applying estoppel here.

*First*, Epicenter's arguments in this appeal are "'clearly inconsistent'" with its position before the London Tribunal. *New Hampshire*, 532 U.S. at 750. Again, Epicenter conceded before the Tribunal that the arbitration provision of the Intercreditor Agreement applied; that Epicenter's claims (including against Burford) were subject to arbitration; and that the Tribunal had jurisdiction to decide those claims. Epicenter's arguments in this appeal are the exact opposite.

*Second*, Epicenter succeeded in persuading the Tribunal to adjudicate its claims. *See New Hampshire*, 532 U.S. at 750. The Tribunal accepted as "common ground" that "the Note incorporated by reference the Arbitration Agreement [in the Intercreditor Agreement] and that the Tribunal [had] jurisdiction to decide the claims brought by [Epicenter]." SER-28. "[B]ased on" that common ground and its analysis of the relevant agreements, the Tribunal accepted that it had jurisdiction to determine Epicenter's claims and proceeded to decide them. SER-93.

*Third*, Epicenter "would derive an unfair advantage or impose an unfair detriment on [the Investors] if not estopped." *New Hampshire*, 532 U.S. at 751. The district court and this Court both determined earlier in this litigation that the Tribunal would decide its own jurisdiction and whether "any of the claims [were] not arbitrable." 2-ER-97. If Epicenter

had challenged the arbitrability of its claims before the Tribunal, as both the district court and this Court expected it to, and the Tribunal had determined that one or more of Epicenter's claims were not arbitrable, then the Investors could have saved substantial resources arbitrating those claims before the Tribunal. Instead, the Investors spent more than £6,000,000 in legal costs arbitrating each of Epicenter's claims in exhaustive detail. 2-ER-63.

Epicenter should be estopped from attempting to relitigate its claims now—and forcing the Investors to spend yet more money on legal fees—after agreeing that the Tribunal had jurisdiction to decide those claims.

### C. Epicenter is bound to arbitration agreements subject to the Convention, and those agreements delegated all questions of arbitrability to the London Tribunal.

Even if the Convention permitted this Court to consider Epicenter's objections, and even if neither waiver nor estoppel applied, the Court should affirm the judgment below because the district court's decision compelling arbitration was clearly correct. Epicenter's arguments to the contrary are meritless.

#### 1. The district court's decision rested on plain contract text, not any faulty presumption.

Epicenter's lead argument (OB 20–25)—that the district court supposedly erred in subscribing to a pro-arbitration policy—provides no basis to vacate the judgment below. As an initial matter, even after *Mor-*

*gan*, 596 U.S. at 418, federal courts of appeals have continued to apply a presumption in favor of *international* arbitration. *See, e.g.*, *Compania de Inversiones Mercantiles S.A.* v. *Grupo Cementos de Chihuahua S.A.B. de C.V.*, 58 F.4th 429, 461 (10th Cir. 2023) ("[T]he Supreme Court has recognized the emphatic federal policy in favor of arbitral dispute resolution that applies with special force in the field of international commerce.") (cleaned up); *Green Enters., LLC* v. *Hiscox Syndicates Ltd. at Lloyds of London*, 68 F.4th 662, 677 (1st Cir. 2023) (similar).

More importantly, nothing in the district court's analysis turned on policy considerations; the district court enforced the unambiguous language of the parties' agreements. *See* 1-ER-13–19. There is no need to apply a presumption on appeal either, as Epicenter's arguments fail on the plain text as a matter of law.

### 2. Epicenter is bound by two arbitration agreements, which are incorporated into the Note.

In resolving a motion to compel arbitration, the court must first "determine[] whether a valid arbitration agreement exists." *Henry Schein, Inc.* v. *Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019). There is no dispute that *two* valid arbitration agreements exist between the parties here. Epicenter acknowledges, as it must, that its predecessors signed both the 2013 FPA and Intercreditor Agreement; that it is bound by those agreements to the same extent as those predecessors; and that both agreements "have thorough arbitration clauses." OB 26; *see also id.*

7–8, 25–31, 27 n.5, 37. Epicenter does not argue that those agreements are "null and void, inoperative or incapable of being performed." 21 U.S.T. at 2519. Nor does Epicenter raise any other arguments casting doubt on the validity of the agreements.

Moreover, Epicenter does not dispute—nor could it—that both agreements are subject to the Convention and Chapter 2 of the FAA. Not only do the agreements say so on their face (3-ER-301, 3-ER-333), they easily satisfy the requirements set forth in the Convention itself and confirmed by this Court: (1) the agreements are in writing and signed by the Debtors and Ganymede; (2) they require nondomestic arbitration in the territory of a Convention signatory (the United Kingdom); (3) they arise out of the commercial relationship between the Debtors and Ganymede; and (4) Ganymede is not a citizen of the United States. *Balen* v. *Holland Am. Line Inc.*, 583 F.3d 647, 654–655 (9th Cir. 2009).[9]

It is thus undisputed that Epicenter is bound by valid arbitration agreements subject to the Convention and Chapter 2 of the FAA. And the contractual text is clear that these interrelated agreements govern disputes regarding the Note. As the district court explained, the Note was executed simultaneously with the 2013 FPA, the Intercreditor Agreement, and the Deed of Trust as a set of integrated agreements to govern

---

[9] The fact Burford did not sign the April 2013 Agreements is not relevant at this stage of the analysis. Article II(1) and (2) of the Convention address the recognition of arbitration agreements and require only that the agreements be "both written and signed." *Outokumpu*, 590 U.S. at 445.

the parties' financial relationship. *See supra* pp. 14–15. The Note expressly states that it was issued "pursuant to" the 2013 FPA and is "subject to" the Intercreditor Agreement. 2-ER-136–137. It also says that "[i]n the event of any conflict between this instrument [the Note] and the Intercreditor Agreement, the Intercreditor Agreement shall control." 2-ER-136.

Because the Note is "subject to" the Intercreditor Agreement, it incorporates and is "subject to" the arbitration provision in that agreement. *See Progressive Cas. Ins. Co.* v. *C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 46–49 (2d Cir. 1993) (incorporating arbitration clause where an agreement without that clause was "[s]ubject to" another agreement with an arbitration clause); *Standard Bent Glass Corp.* v. *Glassrobots Oy*, 333 F.3d 440, 447–450 (3d Cir. 2003) (holding that arbitration clause was incorporated by reference and affirming motion to compel under the Convention); *Edwards* v. *Vemma Nutrition*, No. 17-cv-02133, 2018 WL 637382, at *4 (D. Ariz. Jan. 31, 2018) (finding that plaintiff agreed to arbitration by assenting to an agreement that incorporated by reference procedures that included arbitration).

Moreover, the text of the arbitration provisions in the 2013 FPA and Intercreditor Agreement is unquestionably broad enough to cover claims arising out of or in connection with the Note. *See, e.g.*, *Nat'l Am. Ins. Co.* v. *SCOR Reinsurance Co.*, 362 F.3d 1288, 1292 (10th Cir. 2004) ("any dispute" language reached a dispute arising under a contract with-

-40-

out an arbitration provision where both contracts were "more than related; they are dependent on each other"); *Neal* v. *Hardee's Food Sys., Inc.*, 918 F.2d 34, 37 (5th Cir. 1990) (compelling arbitration where two "individual agreements were integral and interrelated parts of the one deal," signed by the same parties, and executed contemporaneously).

### 3. The arbitration agreements delegated questions of arbitrability to the arbitral tribunal.

Given that valid arbitration agreements undisputedly exist, the next question is who decides whether Epicenter's dispute is subject to arbitration under those agreements: the court or the arbitrators? As the Supreme Court has explained, "parties can form multiple levels of agreements concerning arbitration." *Coinbase, Inc.* v. *Suski*, 602 U.S. 143, 148 (2024). "At a basic level, parties can agree to send the merits of a dispute to an arbitrator." *Id.* "They can also agree by contract that an arbitrator, rather than a court, will resolve … whether a dispute is subject to arbitration—*i.e.*, its arbitrability." *Id.* (cleaned up). Parties may delegate questions of arbitrability to arbitration "so long as the parties' agreement does so by 'clear and unmistakable' evidence." *Henry Schein*, 586 U.S. at 69.

The district court correctly determined that the parties here clearly and unmistakably delegated questions of arbitrability by incorporating the LCIA Rules. 1-ER-14–17. Epicenter's counterarguments do not withstand scrutiny.

-41-

(52 of 74), Page 52 of 74    Case: 24-721, 07/07/2025, DktEntry: 49.1, Page 52 of 74

### a. The parties' incorporation of the arbitral tribunal's rules is clear and unmistakable evidence of delegation.

The arbitration agreements here expressly incorporated the "Arbitration Rules" of the LCIA. The Intercreditor Agreement says that "[a]ny dispute, controversy or claim arising out of or in connection with this Agreement shall … be referred to and finally resolved by arbitration under the Arbitration Rules of the London Court of International Arbitration." 3-ER-333. The 2013 FPA says the same thing. 3-ER-301.

Article 23.1 of the LCIA Rules provides that "[t]he Arbitral Tribunal shall have the power to rule upon its own jurisdiction and authority, including any objection to the initial or continuing existence, validity, effectiveness or scope of the Arbitration Agreement." LCIA, *LCIA Arbitration Rules 2020*, art. 23.1, https://bit.ly/3ShI70b. That language is substantively identical to that in (i) the rules of the American Arbitration Association ("AAA"), which say that the "arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the ... validity of the arbitration agreement," *Portland Gen. Elec. Co.* v. *Liberty Mut. Ins. Co.*, 862 F.3d 981, 985 (9th Cir. 2017) ; (ii) the rules of the International Chamber of Commerce ("ICC"), which say that "any question of jurisdiction or of whether the claims may be determined together in that arbitration shall be decided directly by the arbitral tribunal," *id.* ; and (iii) the rules of the United Nations Commission on International Trade Law ("UNCITRAL"), which say that "[t]he arbitral tri-

bunal shall have the power to rule on objections that it has no jurisdiction," UNCITRAL Arbitration Rules, art. 21, ¶ 1, G.A. Res. 31/98, U.N. Doc. A/RES/31/98 (Dec. 15, 1976), http://bit.ly/3Gqluo2.

This Court and others have repeatedly held that the incorporation of rules with that language is "clear and unmistakable evidence that the parties agreed the arbitrator would decide arbitrability." *Oracle Am., Inc.* v. *Myriad Grp. A.G.*, 724 F.3d 1069, 1074–1075 (9th Cir. 2013) (sophisticated parties "shall be expected to understand that incorporation of the UNCITRAL rules delegates questions of arbitrability to the arbitrator."); *see Portland General*, 862 F.3d at 985 (incorporation of ACC and ICC rules is clear and unmistakable evidence of intent to delegate gateway issues to arbitrator); *Innospec Ltd.* v. *Ethyl Corp.*, No. 14-cv-158, 2014 WL 5460413, at *3–4 (E.D. Va. Oct. 27, 2014) (same with incorporation of LCIA rules). Epicenter cites no case to the contrary.

Thus, pursuant to the parties' agreements incorporating the LCIA Rules, even if there were serious questions whether Epicenter's claims fall within the parties' arbitration agreements (there are not), those questions were correctly referred to the Tribunal for decision.

### b. Epicenter is bound by the delegation clause, including on its claims against Burford.

Epicenter argues (OB 43) that "[e]ven assuming the district court could have properly delegated the arbitrability of the claims against Ganymede to the LCIA, it still committed error in allowing Burford to enforce

-43-

the [Intercreditor Agreement's] incorporated delegation provision." That is incorrect, as the district court explained. Courts have repeatedly recognized that broad delegation clauses, like the one controlling here, are binding on signatories with respect to *all claims*, especially where both a signatory (like Ganymede) and a nonsignatory (like Burford) are attempting to enforce their rights against a signatory (like Epicenter via its predecessors-in-interest).

In *Brittania-U Nigeria, Ltd.* v. *Chevron USA, Inc.*, 866 F.3d 709 (5th Cir. 2017), for example, Brittania-U signed an arbitration agreement with Chevron that incorporated the UNCITRAL rules. *Id.* at 711. After Brittania-U sued Chevron and two individuals, all three defendants moved to dismiss in favor of arbitration. *Id.* at 712. The Fifth Circuit held that the delegation of arbitrability via incorporation of the UNCITRAL rules applied to the individuals even though they didn't sign the arbitration agreement. *Id.* at 714–715. The court explained that although the arbitration agreement did not explicitly state that it bound nonsignatories, it did explicitly bind Brittania-U, and the delegation provision therefore applied "even with regard to Britannia-U's dispute with [the individuals." *Id.* at 715. The Fifth Circuit thus held that "a signatory and two nonsignatories" (Chevron and the individuals) could enforce the delegation clause against the signatory (Brittania-U). *Id.*

In reaching that conclusion, the Fifth Circuit cited a Second Circuit case with a similar fact pattern: *Contec Corp.* v. *Remote Solution, Co.*, 398

-44-

F.3d 205 (2d Cir. 2005). There, Contec Corporation filed suit to compel Remote Solution to arbitrate the parties' dispute. *Id.* at 207. The arbitration agreement delegated questions of arbitrability via incorporation of the AAA rules, but Contec Corporation had not signed it; only an earlier version of the company had. *Id.* at 207–208. The Second Circuit held that Contec Corporation could compel Remote Solution to determine arbitrability through arbitration, because Remote Solution had "agreed to be bound by provisions that clearly and unmistakably allow[ed] the arbitrator to determine her own jurisdiction." *Id.* at 211 (cleaned up). "[A]s a signatory to a contract containing an arbitration clause and incorporating by reference the AAA Rules," the Second Circuit explained, Remote Solution could not "disown its agreed-to obligation to arbitrate *all* disputes, including the question of arbitrability." *Id.*

The case that Epicenter relies on, *Kramer* v. *Toyota Motor Corp.*, 705 F.3d 1122 (9th Cir. 2013), is not to the contrary. There, the plaintiffs signed arbitration agreements with several car dealerships. *Id.* at 1124. Toyota, a nonsignatory, moved to compel arbitration. *Id.* This Court held that the question of arbitrability was for a court rather than the arbitrator because the agreements at issue did not contain clear and unmistakable evidence of an agreement to delegate arbitrability; rather, "the terms of the arbitration clauses [were] expressly limited to Plaintiffs and the Dealerships." *Id.* at 1127; *see id.* at 1128 ("Plaintiffs only agreed to arbitrate arbitrability—or any other dispute—with the Dealerships

because the arbitration clause is limited to claims between 'you and us'—i.e. Plaintiffs and the Dealerships.").

*Kramer* thus turned on the specific language of the arbitration agreement limiting the delegation clause to the signatories. Here, by contrast, the delegation clause in the Intercreditor Agreement is capacious: it provides that "[a]ny dispute, controversy or claim arising out of or in connection with this Agreement shall … be referred to and finally resolved by arbitration under the Arbitration Rules of The London Court of International Arbitration." 3-ER-333; *see also* 3-ER-301 (same provision in 2013 FPA). This delegation clause is not limited to disputes between Epicenter's predecessors and Ganymede; it encompasses *any dispute* arising out of or in connection with the Intercreditor Agreement. *Cf. Ali* v. *Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) ("[R]ead naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'") (citation omitted). *Kramer* accordingly does not apply here. *See Worldwide Film Prods., LLC* v. *JPMorgan Chase Bank, N.A.*, No. 19-cv-10337, 2020 WL 2730926, at *3 (C.D. Cal. Mar. 13, 2020) (delegating questions of arbitrability to the arbitrator where, unlike *Kramer*, the arbitration provision was not limited to signatories).[10]

---

[10] Another case that Epicenter cites (OB 43–44) simply follows *Kramer* in concluding that a delegation provision did not apply to a nonsignatory where the "the arbitration agreement [was] crystal clear that it applie[d] only to disputes between [the signatories]." *Young* v. *ByteDance Inc.*, 700 F. Supp. 3d 808, 811 (N.D. Cal. 2023).

-46-

The terms of the contracts here bound Epicenter, like the signatories in *Brittania-U* and *Contec*, to arbitrate *all* disputes—including the question of arbitrability—arising out of or in connection with the Intercreditor Agreement and the other April 2013 Agreements it controls. That includes the question whether Epicenter's claims against Burford were subject to arbitration.

### c. Epicenter's counterarguments are meritless.

Epicenter's attempt to evade the delegation clause is unavailing. Because Epicenter cannot deny that it agreed to valid arbitration provisions in the Intercreditor Agreement and 2013 FPA, both of which include delegation clauses, Epicenter attempts to sidestep those agreements altogether by arguing that it is suing exclusively under the *Note*— which it characterizes as a "patently ... separate agreement[]," OB 25— and claiming that "disputes related to the Note ... should proceed in court," OB 34. Epicenter invokes the Supreme Court's *Coinbase* decision, which held that where contracting parties have agreed to two separate contracts—one of which contains an arbitration provision with a delegation clause, and one of which contains a forum-selection clause providing that disputes must be decided by a court—a court (rather than an arbitrator) must decide which contract controls. 602 U.S. at 145.

*Coinbase* has no applicability here. By its terms, the rule of that opinion applies only where (i) the parties have agreed to two separate contracts (ii) with conflicting dispute-resolution mechanisms. *Neither* cri-

terion applies here because the April 2013 Agreements are integrated and fully compatible.

    **i.**    As explained above, the Note was executed simultaneously and integrated with the 2013 FPA, the Intercreditor Agreement, and the Deed of Trust. *See supra* pp. 8–12. The documents refer expressly to each other: The Note states that it was issued "pursuant to" the 2013 FPA and "subject to" the Intercreditor Agreement, with the latter "control[ling]" "in the event of any conflict between [the Note] and the Intercreditor Agreement." 2-ER-136–137. Likewise, the 2013 FPA says that the "payment obligations" of the Debtors "shall be evidenced and/or secured by" the Intercreditor Agreement, the Note, and the Deed of Trust, with the terms of the Intercreditor Agreement prevailing in the event of a conflict. 3-ER-298. And the Deed of Trust, which provided security for the Note, says that it is subject to the Intercreditor Agreement. MTS-EX-1 at 22.

    In addition to the explicit cross-references, the documents work together substantively: The 2013 FPA and Intercreditor Agreement determine the parties' substantive obligations and rights, while the Note and associated Deed of Trust secure Epicenter's obligation and provide for optional means of enforcement in the event of default.

    Accordingly, there are not two separate contracts here, as in *Coinbase*, but rather a group of integrated agreements, executed simultaneously, that are related to and dependent on each other. *Cf. Simula, Inc.* v. *Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999) (holding that all claims

were subject to the arbitration clause in one of three related agreements); *see also, e.g.*, *SCOR Reinsurance*, 362 F.3d at 1292 ("any dispute" language reached the parties' dispute arising under contract without an arbitration provision where both contracts were "more than related; they [were] dependent on each other"); *Sinclair* v. *Servicemaster Co.*, No. 07-cv-611, 2007 WL 3407138, at *6 (E.D. Cal. Nov. 14, 2007) (the absence of an arbitration clause in one agreement was "of no consequence" because the plaintiff's claim "touches matters" covered by another agreement containing an arbitration clause, and both agreements were "necessarily intertwined").

**ii.**     Even if the Note could be considered a wholly separate agreement, it does not have a conflicting forum-selection clause. Epicenter itself acknowledged as much during the arbitration proceedings. *See* RJN-EX-E at 22 (acknowledging that "the Note *per se* did not contain a forum selection clause").

Epicenter now takes a contrary position, arguing (OB 34) that the Note's reference to "attorneys' fees and court costs" shows "clear intent that disputes related to the Note could and should proceed in court." The full Note provision in which that reference appears shows why Epicenter's argument is wrong:

> [The Debtors] shall pay all costs and expenses, including reasonable attorneys' fees and court costs, *incurred in the collection or enforcement of all or any part of this Note.* All such costs and expenses shall be secured by the Deed of Trust and

> by all other Security Documents. In the event of any court pro-
> ceedings, court costs and attorneys' fees shall be set by the
> court and not by jury and shall be included in any judgment
> obtained by [Ganymede].

2-ER-137 (emphasis added). The relevant text is a *collection* provision, not a forum-selection or dispute-resolution clause (as in *Coinbase*) specifying how substantive disputes must be resolved. And the relevant text by its terms exists for the benefit of the *Investors*—not so that Epicenter can claim a right to bring suit in court.

The purpose of the collection provision makes perfect sense in the context of the transaction as a whole. The Debtors owed Ganymede $50,713,000 under the 2013 FPA, a sum they promised to pay in the Note. That obligation was secured by land in Arizona, which the Debtors assigned in trust for Ganymede's benefit via the Deed of Trust. The Deed of Trust, in turn, gave Ganymede various options for taking control of the Arizona land in the event of default under the 2013 FPA and Note, including judicial foreclosure and the appointment of a court-ordered receiver. MTS-EX-1 at 17–19; *see also* 3-ER-295–296, 3-ER-298, 3-ER-313, 3-ER-316; SER-26. Ganymede's exercise of those options would require some involvement with the Arizona legal system, potentially giving rise to court costs and attorneys' fees.[11]

---

[11] The reference to "jury" simply makes it clear that, as to costs and fees, there is not to be a jury involved. It does not create a jury right or suggest that the Note may be adjudicated in a domestic court rather than in arbitration. *Contra* OB 18.

The clear purpose of the collection provision was thus to ensure that the Debtors would be responsible for any court costs and attorneys' fees incurred in collecting on the Note by monetizing the land in Arizona. Substantive disputes regarding the Debtors' obligations, by contrast, were to be arbitrated in London. There is accordingly no merit to Epicenter's argument (OB 31–35) that incorporating the arbitration provision of the Intercreditor Agreement into the Note would render the collection provision superfluous. The arbitration provision dictates how the parties must resolve substantive disputes regarding what the parties owe to each other; the collection provision specifies who pays for efforts to collect on those obligations. Unlike in *Coinbase*, nothing in any of the April 2013 Agreements "either explicitly or implicitly send[s] arbitrability disputes to the courts." 602 U.S. at 152.

Moreover, even if Epicenter could identify some genuine tension between the instruments, the Intercreditor Agreement and 2013 FPA expressly control. The Note was issued "pursuant" to the 2013 FPA and is "subject to" the Intercreditor Agreement. 2-ER-136–137. And the Note plainly states: "In the event of any conflict between this instrument and the Intercreditor Agreement, the Intercreditor Agreement shall control." 2-ER-136. The 2013 FPA and the Deed of Trust include the same language specifying that the terms of the Intercreditor Agreement prevail in the event of any conflict. *See* 3-ER-298 (2013 FPA); MTS-EX-1 at 22.

-51-

The Intercreditor Agreement is thus the master agreement that controls in the event of any conflict with the other agreements. That makes sense: the Intercreditor Agreement details how the Debtors would satisfy their obligations to both Ganymede and Simpson Thacher, which means it had to perform the traffic-directing function of coordinating the interrelated agreements executed to accomplish that aim. It is thus natural that the parties gave it primacy as the controlling document.

Epicenter's attempt to make a textual counterargument fails. Epicenter points to one sentence of the Note saying: "Each holder of this instrument, by its acceptance thereof, irrevocably agrees to be bound by the provisions of the Intercreditor Agreement." 2-ER-136. According to Epicenter (OB 27–29), that sentence means that *only* the holder of the Note—i.e., Ganymede and any subsequent owners/transferees—is bound by the provisions of the Intercreditor Agreement.

But no reasonable person could read the Note that way. The sentence that Epicenter points to is the second sentence of the Note; it is sandwiched between the first sentence, which says that the Note and any rights Epicenter may have under the Note are "subject to" the Intercreditor Agreement, and the third sentence, which specifies that the terms of the Intercreditor Agreement control in the event of a conflict. 2-ER-136. The broad, plain language of the first and third sentences makes clear that the Note as a whole is subject to the Intercreditor Agreement, which controls in the event of any conflict. *Id.* The second sentence is intended

-52-

to bind *both current and future holders of the Note* to the incorporated terms of the Intercreditor Agreement, including the arbitration agreement. The language of the second sentence does not purport to limit the express generality of the first and third sentences. Indeed, it would make those sentences non-sensical if Epicenter's argument were accepted. Epicenter's reading would also require the Court to insert the word "only" into the second sentence, in violation of the basic principle that "courts cannot add words to a contract which would impermissibly re-write that contract." *JAE Props., Inc.* v. *AMTAX Holdings 2001-XX, LLC*, 716 F. Supp. 3d 918, 939 (S.D. Cal. 2024).

*

In sum, the district court correctly determined that the Intercreditor Agreement clearly and unmistakably delegated questions of arbitrability to the arbitrators. The London Tribunal then correctly resolved those questions in favor of arbitrability—which was easy to do because Epicenter conceded arbitrability across the board. This Court need go no further to dismiss this appeal.

### D.    Epicenter's claims were within the scope of the arbitration provisions.

Even if questions of arbitrability had not been delegated to the Tribunal, Epicenter's claims against both Ganymede and Burford were clearly subject to arbitration.

-53-

### 1. Epicenter's claims against Ganymede were subject to arbitration.

It is plain from the face of the Second Amended Complaint that Epicenter's claims arose out of, or were connected to, the April 2013 Agreements. Those claims were thus within the scope of the two arbitration provisions in those agreements.

The Second Amended Complaint alleged that the Debtors needed financing to pay Simpson Thacher for its work in the real estate litigation, 3-ER-177; that Burford, via its subsidiary Ganymede, agreed to provide that financing in exchange for a contingent interest in the real estate litigation, 3-ER-178; that the parties' agreement was memorialized in the FPA, *id.*; that the parties restated and amended the FPA several times, *id.*; that the Debtors executed the Note in the amount of the debt owed under the final FPA, 3-ER-180–181; and that the Investors later marketed the Note, supposedly wrongfully, 3-ER-182–189.

The FPA—as amended and restated, including in 2013—is accordingly central to Epicenter's claims. The 2013 FPA (like all preceding versions) requires the parties to arbitrate "[a]ny dispute, controversy or claim arising out of or in connection with this Agreement." 3-ER-301. And the 2013 FPA is "subject to the terms and conditions of the Intercreditor Agreement," 3-ER-298, which likewise requires the parties to arbitrate "[a]ny dispute controversy, or claim arising out of or in connection with this Agreement." 3-ER-333. The simultaneously executed Note was

issued "pursuant to" the 2013 FPA and made "subject to" the Intercreditor Agreement—thereby again incorporating both documents, and their arbitration provisions, by reference. 2-ER-136–137.

The Supreme Court and this Court have both recognized that the very same language used in the arbitration provisions of the 2013 FPA and Intercreditor Agreement—"arising out of or in connection with"—sweeps broadly and encompasses all claims that touch on the parties' contractual relationship, including both contractual claims and non-contractual claims. *See, e.g., Prima Paint Corp.* v. *Flood & Conklin Mfg. Co.*, 388 U.S. 395, 398, 406 (1967) (holding that text reading "[a]ny controversy or claim arising out of or relating to this Agreement" was "easily broad enough to encompass [plaintiff's] claim" for "fraud"); *Simula*, 175 F.3d at 721 (concluding that "the language 'arising in connection with' reaches … all disputes having their origin or genesis in the contract"); *Schoenduve Corp.* v. *Lucent Techs., Inc.*, 442 F.3d 727, 732 (9th Cir. 2006) (holding that the phrase "'if a dispute arises out of or relates to this Agreement,' was broad enough to include a claim … based on quasi-contract or estoppel").

Here, the many allegations in the Second Amended Complaint referring to the FPA demonstrate that Epicenter's claims, at a minimum, "ar[ose] out of" or were "in connection with" the FPA as amended, supplemented, and restated. Those claims were thus subject to arbitration under the terms of that instrument.

Moreover, Epicenter's claims also "ar[ose] out of" and were "in connection" with the Intercreditor Agreement, for two reasons. *First*, the obligation in the Intercreditor Agreement to arbitrate "[a]ny dispute, controversy or claim arising out of or in connection with this Agreement" (3-ER-333) is expressly incorporated into the Note, and therefore requires arbitration of all claims arising out of or in connection with the Note. 2-ER-136–139; *see supra* pp. 39–41.

*Second*, Epicenter's claims fall within the broad scope of the Intercreditor Agreement's arbitration clause because it would be impossible to determine liability under the Note without determining the rights and obligations of the parties under all of the April 2013 Agreements. The gravamen of Epicenter's claims is that the Investors somehow breached the covenant of good faith implied in the Note and interfered with the Debtors' business expectations by selling and assigning the FPA and the Note. But the FPA expressly states that Ganymede "may assign its rights and obligations under this agreement without the express consent in writing of [Epicenter's predecessors]," 3-ER-274, 3-ER-300; the Note states that it "shall inure to the benefit of [Ganymede], and any subsequent holders of this Note, and their successors and assigns," 2-ER-138; and both the FPA and Note are subordinated to the Intercreditor Agreement, 3-ER-298, 2-ER-136–139. Accordingly, all disputes arising out of or connected to the April 2013 Agreements, including disputes concerning the Note, were subject to arbitration.

-56-

### 2. Epicenter's claims against Burford were subject to arbitration.

The preceding analysis applies equally to Epicenter's claims against Burford—Ganymede's ultimate parent. The district court correctly held that, although Burford was not a signatory to the arbitration agreements, under long-standing principles of estoppel, Epicenter could not avoid arbitration through the subterfuge of adding identical claims against a non-signatory parent company. 1-ER-17–19.

Enforcement of an arbitration agreement by a non-signatory under the FAA is governed by the law of the forum state. *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009); *In re Henson*, 869 F.3d 1052, 1059–1060 (9th Cir. 2017).[12] Arizona law allows a nonsignatory to enforce an arbitration clause against a signatory under principles of "alternative estoppel" when either (1) "the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided," or (2) "each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement [and] the signatory's claims arise out of and relate directly to the written agreement." *Sun Valley Ranch 308 Ltd. P'ship ex rel. Englewood Props., Inc.* v. *Robson*, 294 P.3d

---

[12] The Supreme Court has confirmed that the "Convention does not conflict with the enforcement of arbitration agreements by nonsignatories under domestic-law equitable estoppel doctrines." *Outokumpu*, 590 U.S. at 445.

-57-

125, 134–135 (Ariz. Ct. App. 2012) (quoting *CD Partners, LLC* v. *Grizzle*, 424 F.3d 795, 798 (8th Cir. 2005)); *see also Mundi* v. *Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1046 (9th Cir. 2009) (recognizing the same two-part test). Both tests for estoppel are easily satisfied here.

a.    **Close relationship.** The relationship between Ganymede and Burford is "sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided." *Sun Valley Ranch*, 294 P.3d at 134–135 (quoting *CD Partners*, 424 F.3d at 798). The Second Amended Complaint includes more than 50 allegations against "Defendants," making no distinction between Ganymede and Burford. *See* 3-ER-181–189. Epicenter itself alleges that Burford and Ganymede are so closely related that they should be treated as one and the same:

> Burford exercised substantially total control over the management and activities of Ganymede during Ganymede's entire existence as a corporate legal entity. Ganymede had no separate will, or existence of its own, but instead its sole purpose was to serve as a business conduit for Burford during its dealings with Epicenter and Gray.

3-ER-185.

Courts routinely apply estoppel in cases with similar allegations. In *Bonner* v. *Michigan Logistics Inc.*, 250 F. Supp. 3d 388 (D. Ariz. 2017), for example, the court held that plaintiff could not avoid arbitration where it alleged that the defendants—only one of which was a signatory

-58-

to the arbitration agreement—had "common management," "centralized control of labor relations," "common ownership," and constituted "a single employer" and an "integrated enterprise." *Id.* at 397–399. The court in *Sun Valley* reached the same result, holding that the plaintiff was estopped from avoiding arbitration against nonsignatory defendants where the plaintiff alleged concerted misconduct. 294 P.3d at 134.[13]

As multiple courts have recognized, where "the charges against a parent company and its subsidiary are based on the same facts and are inherently inseparable," arbitration "would be rendered meaningless" if the non-signatory "parent corporation was forced to try the case." *J.J. Ryan & Sons, Inc.* v. *Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 320–321 (4th Cir. 1988) (cleaned up); *see also Prograph Int'l Inc.* v. *Barhydt*, 928 F. Supp. 983, 990–991 (N.D. Cal. 1996) (compelling arbitration where "the allegations against the nonsignatory corporation do not differ substantially from those against its signatory affiliate").

---

[13] *See also Aggarao* v. *MOL Ship Mgmt. Co.*, 675 F.3d 355, 373–374 (4th Cir. 2012) ("without a doubt," non-signatory defendant may "compel a signatory to the clause to arbitrate the signatory's claims," where plaintiff asserted the same causes of action against each defendant and made identical allegations) (cleaned up); *CD Partners*, 424 F.3d at 798–799 (compelling arbitration based on franchisee's claims against non-signatory principals of franchisor); *Astra Oil Co.* v. *Rover Navigation, Ltd.*, 344 F.3d 276, 279–281 (2d Cir. 2003) (compelling arbitration based on non-signatory's "close corporate and operational relationship" with signatory).

**b.    Intertwined claims.** The second test for estoppel is also met here because Epicenter's "claims against Burford are … founded in and intertwined with Ganymede's obligations and rights under the Note." 1-ER-18. Again, the gravamen of Epicenter's claims is that "Defendants" acted wrongfully in selling and assigning the FPAs and Note, which are inextricably bound together. Epicenter's claims both "make[] reference to" and "presume[] the existence of the written agreement," and "the signatory's claims arise out of and relate directly to the written agreement." *Sun Valley Ranch*, 294 P.3d at 134–135 (citation omitted).

The interconnection is clear from the allegations Epicenter pleads in support of each of its three claims. The first cause of action seeks a declaration that "Ganymede's corporate veil may be disregarded as a mere alter ego of Burford" because Burford supposedly controlled Ganymede in negotiating and marketing the Note. 3-ER-186–187. The second cause of action alleges that Ganymede and Burford breached the duty of good faith and fair dealing "by taking actions inconsistent with the agreed upon purpose and reasonable expectations of the parties when entering into the Note." 3-ER-187. That claim against Burford "entirely depends on Burford being found to be a party to the Note." 1-ER-19. The third cause of action is "alleged against only Burford" but claims that Burford tortiously interfered with the Debtors' business expectancy "stem[ming] from how Ganymede, not Burford, marketed and then sold the Note." *Id.* All three claims against Burford thus "necessarily rely on

-60-

the existence of the Note and require an examination of Ganymede's rights and obligations under the Note," *id.*—which was issued "pursuant to" the 2013 FPA and made "subject to" the Intercreditor Agreement.

Burford was therefore entitled to enforce the agreements to arbitrate. "[I]t would be manifestly inequitable to permit" a signatory plaintiff like Epicenter to allege claims against Burford arising out of the contracts containing the arbitration agreements, "and at the same time deny that [the non-signatory (Burford)] is a party to that agreement in order to avoid arbitration of claims clearly within the ambit of the arbitration clause." *Hughes Masonry Co.* v. *Greater Clark Cnty. Sch. Bldg. Corp.*, 659 F.2d 836, 838–839 (7th Cir. 1981); *see also Escobal* v. *Celebration Cruise Operator, Inc.*, 482 F. App'x 475, 476 (11th Cir. 2012) (compelling arbitration where the plaintiff's claims against non-signatory were "inextricably intertwined" with his claims against signatory).

-61-

## CONCLUSION

The Court should affirm the district court's judgment dismissing Epicenter's suit with prejudice.

Respectfully submitted,

Lauren Pardee Ruben          *s/ Michael R. Huston*
PERKINS COIE LLP             Michael R. Huston
1900 16th St, Suite 1400       *Counsel of Record*
Denver, CO 80202             Shane R. Swindle
                             PERKINS COIE LLP
                             2525 E Camelback Rd, Suite 500
                             Phoenix, AZ 85016
                             Telephone: (602) 351-8000
                             mhuston@perkinscoie.com

*Counsel for Defendants-Appellees*
*Burford Capital Limited and Ganymede Investments Limited*

July 7, 2025

## CERTIFICATE OF SERVICE

I, Michael R. Huston, certify that on July 7, 2025, I electronically filed the foregoing Answering Brief of Defendants-Appellees Burford Capital Limited and Ganymede Investments Limited with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct.

DATED this 7th day of July, 2025.

*s/ Michael R. Huston*
Michael R. Huston
PERKINS COIE LLP
2525 E Camelback Rd, Suite 500
Phoenix, AZ 85016
Telephone: (602) 351-8000
mhuston@perkinscoie.com

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-721

I am the attorney or self-represented party.

**This brief contains** | 13,991 | **words,** including | 179 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- ☐ it is a joint brief submitted by separately represented parties.
- ☐ a party or parties are filing a single brief in response to multiple briefs.
- ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____ .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Michael R. Huston | **Date** | July 7, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                                          *Rev. 12/01/22*